**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

**GREGORY BLADE**
3865 14th Street
Ecorse, Michigan 48229

*And*

**JEREMY BLUTO AND**
**CLAUDIA SANDOVAL-BLUTO h/w**
100 Westwood Drive
Branson, Missouri 65616

*And*

**LYDELL BOANES**
1519 S. Vogdes Street
Philadelphia, Pennsylvania 19143

*And*

**DAMONE BOWLES AND**
**ADRIENNE BOWLES h/w**
39 Concord Circle
Howell, New Jersey 07731

*And*

**GEORGE BRAVO**
1010 Clower Street
San Antonio, Texas 78201

*And*

**KEITH BUINAUSKAS AND**
**MARCI BUINAUSKAS h/w**
7 Country Farm Road
Oxford, Connecticut 06478

*And*

**TOM BURRIS AND**
**BETTY BURRIS h/w**
1110 Oxford Drive
Pearland, Texas 77584

**JURY TRIAL DEMANDED**

*And*

**FREDERICK DIAZ**
43 Alan Drive
Pleasant Hill, California 94523

*And*

**STANLEY EDRINGTON JR. AND**
**TAMMY EDRINGTON h/w**
525 N East Street
Greensburg, Indiana 47240

*And*

**OSVALDO DIAZ-FERNANDEZ AND**
**ALISHA LEE FERNANDEZ h/w**
2372 55th Street
Fennville, Michigan 49408

*And*

**DOUGLAS FORE AND**
**LEAH RENEE KRAUTTER h/w**
1315 E. 19th Street
Tulsa, Oklahoma 74120

*And*

**SAMUEL KEVIN FOWLER AND**
**MARCELLE FOWLER h/w**
19121 Fawn Creek
Flint, Texas 75762

*And*

**JESSE FRISCO**
5203 White Willow Way
Morgantown, West Virginia 26505

*And*

**YEVGENY GERSHMAN AND**
**KATIE GERSHMAN h/w**
29 Darling Avenue
Bloomfield, New Jersey 07003

*And*

**ANDREW GROSS**
210 W. 3rd Street
Leadville, Colorado 80461

*And*

**COREY HAMILTON AND
MEGAN HAMILTON h/w**
23 Dana Street
Massena, New York 13662

*And*

**WILLIAM KEYES**
1710 Cedar Avenue
Boulder, Colorado 80304

*And*

**RICHARD KOSTNER**
3615 Smith Street
Lincoln, Nebraska 68506

*And*

**PHILLIP LUKASICK AND
MEREDITH LUKASICK h/w**
1917 Barfield Road
Murfreesboro, Tennessee 37128

*And*

**SHAWN MICCICHE AND
LAURA MICCICHE h/w**
2340 Robin Drive
Naples, Florida 34117

*And*

**BILLY OLIVARRIA AND
CRYSTAL OLIVARRIA h/w**
12473 North Rigdon Place
Marana, Arizona 85653

*And*

**ALBERT RIVERA JR.**
270 E Gibson Street
Stockton,  California  95204

*And*

**CHRISTOPHER RUSSELL AND
ANGELA RUSSELL h/w**
9604 Marsh Island Drive
Ocean Springs, Mississippi 39564

*And*

**DALLAS QUARRELS AND
JENNIFER QUARRELS h/w**
1865 Daley Drive
Reese, Michigan 48757

*And*

**FLETCHER SCHIEFELBEIN AND
CHRISTY SCHIEFELBEIN h/w**
2824 W 5600 S. Apartment 1
Roy, Utah 84067

*And*

**JOSHUA SOUTHARD**
1230 Dietz Road
Red Lion, Pennsylvania 17356

*And*

**ROBIN TARBUTTON-WOODWARD
AND WILLIAM WOODWARD h/w**
796 Northwest Waterlily Place
Jenson Beach, Florida 34957

*And*

**RAPHAEL VELEZ**
2006 Vizcaya Drive
Navarre, Florida 35266

4

*And*

**CHRISTOPHER WEST AND**
**NATALIE WEST h/w**
59 N Emory Bend Place
Shenandoah, Texas 77381

*And*

**ADAM WILSON AND**
**RACHEL WILSON h/w**
604 Gap of Ridge Road
Rural Retreat, Virginia 24368

*And*

**COLIN YAKISH**
231 Taylor Drive
Lone Tree, Iowa 52755

*And*

**MICHAEL ANDERSON**
401 S. Burlington Avenue
Lafayette, Colorado 80026

*Plaintiffs,*

v.

**SIG SAUER, INC.**
72 Pease Boulevard
Newington, New Hampshire 03801

*Defendant.*

## PLAINTIFFS' COMPLAINT – CIVIL ACTION

1.    Upon the information discovered through research and document production in the Sig Sauer P320 litigation, the Sig Sauer P320 is the most dangerous pistol sold in the United States market.

2.    Plaintiffs are individuals, including federal law enforcement agents, police officers, combat veterans, firearms instructors, and civilians, who dedicated significant portions of their lives to the safe use of weapons, but who were shot and injured by their defective P320s.

3.    Sig Sauer knew, as early as 2016 and possibly earlier, that unintended discharges was a known risk of the P320's design, as testified to by one of the P320's chief designers, Matt Taylor.

4.    Sig Sauer also knew that unintended discharges of the P320 could result in death to the user or a bystander.

5.    Sig Sauer affirmatively told the U.S. Army that its design of the Sig Sauer P320 **_with_** the inclusion of a manual thumb safety would mitigate the risk of unintended discharges.

6.    The vast majority of Sig Sauer P320 models sold to law enforcement and law abiding citizens does not come with a manual thumb safety even as an option.

7.    No Sig Sauer P320s have come equipped with a tabbed trigger safety.

8.    No Sig Sauer P320s have come equipped with a grip safety.

9.    The vast majority of Sig Sauer P320 models sold to law enforcement and law abiding citizens do not come with an option to include any external safety .

10.    External safeties have been used for many decades by Sig Sauer and its competitors to prevent or limit unintended discharges.

## **PARTIES**

11.    Plaintiff, Gregory Blade ("Plaintiff" or "Blade"), is an adult individual, citizen, and resident of the State of Michigan, residing at the above-captioned address.

12.    Plaintiff, Jeremy Bluto ("Plaintiff" or "Bluto"), is an adult individual, citizen, and resident of the State of Missouri, residing at the above-captioned address.

13.    Plaintiff, Claudia Sandoval-Bluto ("Plaintiff" or "Mrs. Bluto") is the wife of Jeremy Bluto, an adult individual, citizen, and resident of the State of Missouri, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

14.    Plaintiff, Lydell Boanes ("Plaintiff" or "Boanes"), is an adult individual, citizen, and resident of the Commonwealth of Pennsylvania residing at the above-captioned address.

15.    Plaintiff, Damone Bowles ("Plaintiff" or "Bowles"), is an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address.

16.    Plaintiff, Adrienne Bowles ("Plaintiff" or "Mrs. Bowles") is the wife of Damone Bowles, an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

17.    Plaintiff, George Bravo ("Plaintiff" or "Bravo"), is an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address.

18.    Plaintiff, Keith Buinauskas ("Plaintiff" or "Buinauskas"), is an adult individual, citizen, and resident of the State of Connecticut, residing at the above-captioned address.

19.    Plaintiff, Marci Buinauskas ("Plaintiff" or "Mrs. Buinauskas"), is the wife of Keith Buinauskas, an adult individual, citizen, and resident of the State of Connecticut, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

20.    Plaintiff, Thomas Burris ("Plaintiff" or "Burris"), is an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address.

21.    Plaintiff, Betty Buris ("Plaintiff" or "Mrs. Burris"), is the wife of Tom Burris, an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

22.    Plaintiff, Frederick Diaz ("Plaintiff" or "Diaz"), is an adult individual, citizen, and resident of the State of California, residing at the above-captioned address.

23.    Plaintiff, Stanley Edrington Jr. ("Plaintiff" or "Edrington"), is an adult individual, citizen, and resident of the State of Indiana, residing at the above-captioned address.

24.    Plaintiff, Tammy Edrington ("Plaintiff" or "Mrs. Edrington"), is the wife of Stanley Edrington Jr., an individual citizen, and resident of the State of Indiana, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

25.    Plaintiff, Osvaldo Diaz-Fernandez ("Plaintiff" or "Fernandez"), is an adult individual, citizen, and resident of the State of Michigan residing at the above-captioned address.

26.    Plaintiff, Alisha Lee Fernandez ("Plaintiff" or "Mrs. Fernandez"), is the wife of Osvaldo Diaz-Fernandez, an adult individual, citizen, and resident of the State of Michigan, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

27.    Plaintiff, Douglas Fore ("Plaintiff" or "Fore"), is an adult individual, citizen, and resident of the State of Oklahoma, residing at the above-captioned address.

28.    Plaintiff, Leah Renee Krautter ("Plaintiff" or "Ms. Krautter"), is the wife of Douglas Fore, an adult individual, citizen, and resident of the State of Oklahoma, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

29.    Plaintiff, Samuel Kevin Fowler ("Plaintiff" or "Fowler"), is an adult individual, citizen, and resident of the State of Texas residing at the above-captioned address.

30.    Plaintiff, Marcelle Fowler ("Plaintiff" or "Mrs. Fowler") is the wife of Samuel Kevin Fowler, an adult individual, citizen, and resident of the State of Texas , residing at the above-captioned address, and makes claims of loss of consortium as described herein

31.     Plaintiff, Jesse Frisco ("Plaintiff" or "Frisco"), is an adult individual, citizen, and resident of the State of West Virginia, residing at the above-captioned address.

32.     Plaintiff, Yevgeny Gershman ("Plaintiff" or "Gershman"), is an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address.

33.     Plaintiff, Katie Gershman ("Plaintiff" or "Mrs. Gershman"), is the wife of Yevgeny Gershman, an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

34.     Plaintiff, Andrew Gross ("Plaintiff" or "Gross"), is an adult individual, citizen, and resident of the State of Colorado residing at the above-captioned address.

35.     Plaintiff, Corey Hamilton ("Plaintiff" or "Hamilton"), is an adult individual, citizen, and resident of the State of New York, residing at the above-captioned address.

36.     Plaintiff, Megan Hamilton ("Plaintiff" or "Mrs. Hamilton"), is the wife of Corey Hamilton, an adult individual, citizen, and resident of the State of New York, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

37.     Plaintiff, William Keyes ("Plaintiff" or "Keyes"), is an adult individual, citizen, and resident of the State of Colorado, residing at the above-captioned address.

38.     Plaintiff, Richard Kostner ("Plaintiff" or "Kostner"), is an adult individual, citizen, and resident of the State of Nebraska, residing at the above-captioned address.

39.     Plaintiff, Phillip Lukasick ("Plaintiff" or "Lukasick"), is an adult individual, citizen, and resident of the State of Tennessee, residing at the above-captioned address.

40.     Plaintiff, Meredith Lukasick ("Plaintiff" or "Mrs. Lukasick"), is the wife of Phillip Lukasick, an adult individual, citizen, and resident of the State of Tennessee, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

41.     Plaintiff, Shawn Micciche ("Plaintiff" or "Micciche"), is an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address.

42.     Plaintiff, Laura Micciche ("Plaintiff" or "Mrs. Micciche"), is the wife of Shawn Micciche, an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

43.     Plaintiff, Billy Olivarria ("Plaintiff" or "Olivarria"), is an adult individual, citizen, and resident of the State of Arizona, residing at the above-captioned address.

44.     Plaintiff, Crystal Olivarria ("Plaintiff" or "Mrs. Olivarria") is the wife of Billy Olivarria, an adult individual, citizen, and resident of the State of Arizona, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

45.     Plaintiff, Albert Rivera Jr. ("Plaintiff" or "Rivera"), is an adult individual, citizen, and resident of the State of  California  residing at the above-captioned address.

46.     Plaintiff, Christopher Russell ("Plaintiff" or "Russell"), is an adult individual, citizen, and resident of the State of Mississippi, residing at the above-captioned address.

47.     Plaintiff, Angela Russell ("Plaintiff" or "Mrs. Russell"), is the wife of Christopher Russell, an adult individual, citizen, and resident of the State of Mississippi, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

48.     Plaintiff, Dallas Quarrels ("Plaintiff" or "Quarrels"), is an adult individual, citizen, and resident of the State of Michigan, residing at the above-captioned address.

49.     Plaintiff, Jennifer Quarrels ("Plaintiff" or "Mrs. Quarrels"), is the wife of Dallas Quarrels, an adult individual, citizen, and resident of the State of Michigan, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

50.     Plaintiff, Fletcher Schiefelbein ("Plaintiff" or "Schiefelbein"), is an adult individual, citizen, and resident of the State of Utah, residing at the above-captioned address.

51.     Plaintiff, Christy Schiefelbein ("Plaintiff" or "Mrs. Schiefelbein"), is the wife of Fletcher Schiefelbein, an adult individual, citizen, and resident of the State of Utah, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

52.     Plaintiff, Joshua Southard ("Plaintiff" or "Southard"), is an adult individual, citizen, and resident of Commonwealth of Pennsylvania, residing at the above-captioned address.

53.     Plaintiff, Robin Tarbutton-Woodward ("Plaintiff" or "Tarbutton-Woodward"), is an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address.

54.     Plaintiff, William Woodward ("Plaintiff" or "Mr. Woodward"), is the husband of Robin Tarbutton-Woodward, an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

55.     Plaintiff, Raphael Velez ("Plaintiff" or "Velez"), is an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address.

56.     Plaintiff, Christopher West ("Plaintiff" or "West"), is an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address.

57.     Plaintiff, Natalie West ("Plaintiff" or "Mrs. West"), is the wife of Christopher West, an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

58.     Plaintiff, Adam Wilson ("Plaintiff" or "Wilson"), is an adult individual, citizen, and resident of the Commonwealth of Virginia, residing at the above-captioned address.

59.    Plaintiff, Rachel Wilson ("Plaintiff" or "Mrs. Wilson"), is the wife of Adam Wilson, an adult individual, citizen, and resident of the Commonwealth of Virginia, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

60.    Plaintiff, Colin Yakish ("Plaintiff" or "Yakish"), is an adult individual, citizen, and resident of the State of Iowa, residing at the above-captioned address.

61.    Plaintiff, Michael Anderson ("Plaintiff" or "Anderson"), is an adult individual, citizen, and resident of the State of Colorado residing at the above-captioned address, makes claims of negligent infliction of emotional distress as described herein.

62.    Defendant, Sig Sauer, Inc. ("Defendant" or "Sig Sauer") is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, organized and incorporated under the laws of Delaware.

## JURISDICTION AND VENUE

63.    This Court has subject matter jurisdiction pursuant to 28 USC § 1332. There is perfect diversity of citizenship between the parties. The defendant is a resident of New Hampshire and Delaware. Each Plaintiff resides in a state other than New Hampshire and Delaware. The amount in controversy of each claim exceeds $75,000.

64.    This Court has jurisdiction over Sig Sauer under Pennsylvania's Long-Arm Statute, as Sig Sauer has registered to do business in the Commonwealth of Pennsylvania as a foreign corporation (Filing No. 3105395), and maintains a registered office in Pennsylvania. 42 Pa. C.S.A. § 5301(a)(2) and (b). Sig Sauer has thereby consented to personal jurisdiction in Pennsylvania courts. 42 Pa. C.S.A. § 5301(b); *See Mallory v. Norfolk So. Railway Co.*, 600 U.S. 122 (2023); *see also Monge v. Univ. of Pennsylvania,* No. CV 22-2942, 2023 WL 4237078, at *3 (E.D. Pa. June 28, 2023)(citing *Mallory*, 600 U.S. at 134-36)("Where a foreign corporation has consented to suit

in the forum state as a function of registering to do business in that state, the exercise of general jurisdiction is proper.") *see also Abira Med. Lab'ys, LLC v. Freedom Life Ins. Co. of Am.*, No. CV 24-2110, 2025 WL 66687, at *4 (E.D. Pa. Jan. 10, 2025)("In other words, by establishing and maintaining a registered office in Pennsylvania, a foreign corporation agrees to be subject to any suit in Pennsylvania.")(citing *Mallory*, 600 U.S. at 135).

65.     Upon information and belief, the largest, or one of the largest, Sig Sauer P320 sellers/distributors in the country for law enforcement sales is Atlantic Tactical whose headquarters is in Pennsylvania and whose largest retail location is in Philadelphia, Pennsylvania.

66.     Upon information and belief, a number of the law enforcement guns sold that were involved in the below referenced incidents were sold by and through Atlantic Tactical.

67.     Venue is proper in this judicial district under 28 USC 1391(b)(1) and (2), and (c)(2); *See Robinson v. Home Goods, Inc.*, No. CV 23-1945, 2023 WL 5401630, at *1 (E.D. Pa. Aug. 22, 2023) ("Because the defendant corporations consented to jurisdiction when they registered to do business in Pennsylvania, they are deemed residents of Pennsylvania and the Eastern District of Pennsylvania for purposes of venue. Hence, venue in this district is proper under 28 U.S.C. § 1391(c)(2).")

68.     On November 30, 2022, after years of litigation in courthouses across the country involving the defective nature of the Sig Sauer P320, the undersigned firm filed an action in the District Court of New Hampshire, *Armendariz, et al. v. Sig Sauer, Inc.* No. 1:22-cv-00536-JL-AJ, consisting of 20 injured victims of the P320.

69.     On March 24, 2023, Defendant filed a motion in the *Armendariz* case requesting that the Court sever the claims to be re-filed in the Plaintiffs' home states.

70.    On June 27, 2023, the Honorable Joseph Laplante denied Defendant's motion to sever the claims.

71.    Since that date, the undersigned firm has filed an additional 56 claims in the same District Court in New Hampshire, under the assignment of Judge Laplante. All claims have now been consolidated into two actions under the assignment of Judge Laplante: *Armendariz, et al. v. Sig Sauer, Inc.*, No.:22-cv-00536 and *Anderson, et. al. v. Sig Sauer, Inc.*, No.:1:25-cv-00113.

72.    At all times described in the preceding paragraphs, the undersigned firm on behalf of its clients agreed to litigate these matters in Sig Sauer's home state, despite the potential risks of bias in suing a large employer in its home state.

73.    In April 2025, in a strategic attempt to shield itself from liability from the victims of the P320, and to preclude claimants from filing additional actions in the District Court in New Hampshire, Sig Sauer lobbied the legislature and Governor in New Hampshire to provide the company immunity from the claims described herein. See Ex. A, NHPR Article: "Facing a wave of P320 lawsuits, Sig Sauer asked for immunity. NH lawmakers granted it." (May 28, 2025).

74.    Sig Sauer's employees and/or representatives directly contacted New Hampshire lawmakers to lobby for this immunity.

75.    Sig Sauer's employees and/or representatives were directly involved in the drafting of the immunity bill that it sought.

76.    Sig Sauer's employees and/or representatives came up with the idea for the subject immunity bill in New Hampshire.

77.    The immunity bill in New Hampshire is a direct result of the lobbying by Sig Sauer's employees and/or representatives.

78.    Sig Sauer's success in securing immunity for itself has purportedly prevented additional Plaintiffs from filing actions in New Hampshire related to the claims described herein.

79.    While the U.S. Supreme Court's *Mallory* decision afforded this court potential jurisdiction over claims against Sig Sauer since at least June of 2023, the undersigned firm continued to file claims in the District of New Hampshire to facilitate the efficient coordination of these claims. *See Harp, et. al. v. Sig Sauer, Inc.*, No. 1:24-cv-00058.

80.    Sig Sauer's gamesmanship in blocking access to justice in New Hampshire is the sole reason why the undersigned firm is filing this action in Pennsylvania, as is made evident from the actions identified in the preceding averments.

## GENERAL ALLEGATIONS

81.    Sig Sauer designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

82.    Sig Sauer was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. in October 2007.

83.    Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

84.    Ron J. Cohen had direct involvement with the development of the Sig Sauer P320.

85.    Ron J. Cohen had direct involvement in the design characteristics of the Sig Sauer P320.

86.    The Sig Sauer P320 is susceptible to unintended discharges, meaning instances when a gun fires without user intent, at an alarmingly high rate.

87.    There have been over 400 incidents (and likely multiples more) of the Sig Sauer P320 discharging without an intentional trigger pull.

88.    Many of these unintended discharges have caused severe injury to the users and/or bystanders.

89.    The vast majority of these users are law enforcement officers, former military personnel, and/or highly trained and practiced gun owners.

90.    At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, acting within the course and scope of their employment, service and agency.

91.    This action seeks actual, compensatory, and punitive damages, and equitable relief, relating to Defendant, Sig Sauer Inc.'s negligence, gross negligence, recklessness, defective design, and unfair and deceptive marketing practices regarding the P320.


A. **The P320**

92.    The P320 is the first striker-fired pistol Sig Sauer ever manufactured.

93.    In 2012, Sig Sauer embarked on its plan to make a striker-fired pistol to compete with Glock and Smith and Wesson—the industry leaders in striker-fired pistols.

94.    Sig Sauer assembled the P320 using the same frame from an earlier hammer-fired Sig Sauer model, the P250.

95.    Sig Sauer specifically intended to make a shorter trigger pull than its competitors in the striker-fired pistol market, Glock and Smith and Wesson.

96.    Sig Sauer's initial designs for the P320 included a trigger travel of .355 inches.

97.    Yet, Sig Sauer made a pistol with a trigger travel distance far shorter, of just .165 inches (4.2mm) or less.

98.     Sig Sauer's paid firearms consultant, Derek Watkins, admitted that "the SIG Sauer P320 takes approximately 38% less trigger displacement to discharge than the Glock 19 Gen 4."

99.     As a result, the P320 will discharge with minimal trigger movement as compared to its competitors.

100.    The P320 is a single-action pistol.

101.    The trigger on a single-action pistol performs "the single-action" of releasing the hammer or striker.

102.    Single-action guns generally have a short and light trigger.

103.    All Single-Action pistols manufactured by Sig Sauer, other than the P320, have a manual thumb safety.

104.    The trigger of a double-action pistol performs two actions: first cocking the hammer or striker, and the second releasing the hammer or striker.

105.    For double-action pistols, the pistol remains de-cocked after each shot and does not require an external safety.

106.    The P320's chief designer, Sean Toner, admitted that the P320 is a Single-Action pistol. Toner Trial Testimony, *Abrahams v. Sig Sauer,* 86:8-10. (Q: And today in front of this jury you're telling them it is a single action pistol? A. Yes.)

107.    Sig Sauer's own expert witness, Derek Watkins, admitted that the P320 was single-action striker-fired pistol.  Deposition of Derek Watkins, *Slatowski v. Sig Sauer*, 101:14-19

```
14   Q.   What is the P320?
15   A.   It's single.
16   Q.   Okay.  Meaning it is a cocked trigger?
17   A.   It is nearly 100 percent cocked and
18 pulling the trigger releases the striker from the
19 sear.
```

108.    The striker on a P320 is nearly fully cocked whenever there is a round in the chamber.

109.    The P320's other designer, Matt Taylor, admitted that the striker for the P320 is 97% pre-cocked.

110.    Users cannot see for themselves that the P320 is a single or double action gun.

111.    For years, Sig Sauer represented to its users and customers that the P320 was a Double Action Only gun.

> The P320 pistol is a double-action only (DAO) design.
>
> The P320 is offered with an optional ambidextrous manual safety.
>
> 12                          **www.sigsauer.com**

*Sig Sauer P320 User Manual.*

112.    Sean Toner admitted under oath that Sig Sauer's representation of the P320 as a Double Action Only gun was a **false statement**:

> **Q:** Can you read that out loud for the jury, sir?
>
> **A:** Yes. P320 pistol is a double action only (DAO) design.
>
> **Q:** DAO means double action only?
>
> **A:** Yes, that's what it stands for.
>
> **Q** That's a false statement?
>
> **A:** I wouldn't classify it as a double action only, no.
>
> **Q:** Is there a reason you wouldn't consider that a false statement?
>
> **A:** Yes, it's a false statement.

Toner Trial Testimony, *Abrahams v. Sig Sauer*, 10/29/2024 PM, 8:16-9:6.

113.    Other than the P320, Sig Sauer does not make any other single-action guns without an external safety. Toner Trial Testimony, *Desrosiers v. Sig Sauer*, 7/21/2025 51:5-7 ("**Q:** Well, can you name any single-action gun sold by Sig Sauer that does not have an external safety on it? **A:** I believe they all do."); Toner Trial Testimony, *Abrahams v. Sig Sauer*, 10/29/2024 PM, 10:21-24 ("**Q:** So every single action gun Sig ever sold before the P320 had at least one external safety? A: I believe that is correct.").

114.    Upon information and belief, at the time the P320 was designed and sold to the commercial market, every striker-fired pistol on the market except the P320 was equipped with some type of external safety; whether it be a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

115.    Upon information and belief, Sig Sauer manufactures the only striker-fired pistols on the market that are not equipped with any form of external safety.

116.    Sig Sauer designed, and continues to sell the P320 without *any* external safeties.

117.    External safeties, at the time the subject guns were sold, were certainly technologically feasible for the P320.

118.    Thumb safeties, at the time the subject gun was sold, were certainly technologically feasible for the P320.

119.    Grip safeties, at the time the subject gun was sold, were certainly technologically feasible for the P320.

120.    Trigger safeties, at the time the subject gun was sold, were certainly technologically feasible for the P320.

121.    The P320s that injured Plaintiffs did not include a manual safety, grip safety, de-cocker, tabbed-trigger, trigger safety, *or any external safety.*

122.     A properly functioning and active external safety, at the time the subject gun was sold, would preclude a properly functioning P320 from firing in an unintended fashion.

123.     A properly functioning and active thumb safety, at the time the subject gun was sold, would completely preclude a properly functioning P320 from firing in an unintended fashion.

124.     A properly functioning grip safety, at the time the subject gun was sold, would completely preclude a properly functioning P320 from firing unless the grip is pressed in a way that deactivates the grip safety.

125.     A properly functioning trigger safety, at the time the subject gun was sold, would completely preclude a properly functioning P320 from firing unless the trigger is pressed in a way that deactivates the trigger safety.

126.     A tabbed trigger is designed to prevent an unintended discharge when the trigger is subjected to any pressure that isn't a direct firing pull.

127.     Nearly every one of Sig Sauer's competitors in the striker-fired pistol market uses a tabbed trigger, or some other form of a trigger safety.

128.     A tabbed trigger was part of Sig Sauer's initial design for the P320.

129.     Sig Sauer's 2014 marketing materials from its launch of the P320 demonstrates Sig Sauer planned to offer a "tabbed safety trigger" and a "standard trigger."



*P320 Marketing Brochure*

130.    Without question, at was feasible to include a tabbed trigger safety on all P320 models.

131.    Adding a tabbed trigger to the P320 would cost an addition $5 per gun.

132.    Sean Toner, testified that, to his knowledge, Sig Sauer has never produced a Sig P320 with a tab trigger safety.

133.    The combination of the short displacement trigger, the single action design, and the lack of any external safety, renders the P320 defectively designed and unreasonably dangerous for its intended uses.

**B.    Sig Sauer Refusal to Warn the Public of Known Risks of the P320**

       **1. *Drop Fire***

134.    Sig Sauer knew of a drop-fire vulnerability with the P320, and failed to warn the public.

135.    In 2013 and 2014, the P320 failed Sig Sauer's drop testing when, a P320 loaded with a primed casing, was dropped and the gun discharged on impact.

136.    Despite failed drop tests in the design validation stages of the P320, Sig Sauer sold the pistol to the public that it knew, or should have known, was not drop safe.

137.     In 2016, after hundreds of thousands of P320's were sold to the public and law enforcement, other entities performing drop testing of the P320 identified the drop-fire vulnerability with the gun.

138.     In 2016, Sig Sauer submitted a bid for a P320 variant to by selected by German law enforcement and the P320 was subjected to drop testing in Ulm, Germany.

139.     The P320 failed the Ulm drop testing.

140.     As a result, Sig Sauer conducted a root cause analysis, determined that the drop test failure was repeatable, and identified the drop-fire vulnerability .

141.     Also in 2016, a firearms seller, Carical, notified Sig Sauer that the P320 failed its drop testing and was not drop safe.

142.     Also in 2016, Sig Sauer submitted a bid for a P320 variant, the M-17 and M-18, to compete for a $580 million contract to supply the United States Army with a new service pistol in 2016.

143.     The military P320 failed its drop testing standards when dropped with the safety in an off position.

144.     In or about January or February of 2017, the United State Military notified Sig Sauer that the P320 failed drop tests when it discharged upon impact when dropped.

145.     The United States military required Sig Sauer to redesign the trigger and internal components to make the gun drop safe.

146.     Also in 2017, Sig Sauer was notified of multiple reported instances of P320's discharging when dropped in the United States.

147.     Despite Sig Sauer having actual knowledge of the drop-fire vulnerability where the P320 would repeatedly fire on impact when drop at certain angles, it hid this information from the public.

148.     On August 4, 2017, in the face of "internet rumors" that the P320 was not drop-safe, Sig Sauer published a press release, stating that "There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market" and the P320 has safeties that ensure the gun will "only fire when the trigger is pressed."

149.     These statements were false, as (1) both civilian and law enforcement agencies had reported P320 drop fires as of August 4, 2017, to Sig Sauer; (2) Sig Sauer's own internal testing had identified the drop-fire vulnerability; and (3) the Ulm Testing, Caracal, and the US Military had alerted Sig Sauer to the drop-fire vulnerability with the P320.

150.     On August 5, 2017, after communications with Sig Sauer went unanswered, Omaha Outdoors released a YouTube video showing the P320's drop fire vulnerability.

151.     On August 8, 2017—*just four days after reaffirming the safety of the P320*-- Sig Sauer offered a new press release stating "Recent events indicate that dropping the P320 beyond U.S. standards for safety may cause an unintentional discharge."

152.     That same day, Sig Sauer announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."

153.     Sean Toner has admitted to this timeline:

> **Q:** …I'll take it in steps. You keep selling this gun that you know is a hazard for six months, right?
>
> **A:** We did.
>
> **Q:** Omaha Outdoors emailed you, says there's an issue, right?

**A:** Correct.

**Q:** They tell the public there's an issue?

**A:** Yes.

**Q:** And three days after they send you the email, you issue a voluntary upgrade?

**A:** That is the timeline.

Toner Trial Testimony, *Abrahams v. Sig Sauer*, 10/29/2024 PM Session, 41:20-42:6.

154.    Sig Sauer's statement was also false, as there are no federal government standards for gun safety, a fact known to Sig Sauer when it issued this press release.

155.    No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when Congress created the Consumer Product Safety Commission in 1972.

156.    Sig Sauer's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnect switch, and an improved sear to prevent drop-fire discharges.

157.    Even after re-designing the trigger mechanism to fix the drop-fire vulnerability, Sig Sauer has claimed the defective pre-upgrade guns are safe, despite the fact that citizens and law enforcement officers have been severely injured by these guns firing when dropped.

### 2. *Unintended Discharge*

158.    In 2016-17, the United State Military required that Sig Sauer conduct a failure modes effects and criticality analysis.

159.    The purpose of the FMECA was to assess the vulnerabilities of the P320 to certain health and safety risks associated with the use of the P320.

160.    The FMECA identified the first five risks associated with the use of the P320 as being unintended discharges.

161.    One of those five risks was the ***unintended trigger actuation by a foreign object.***

162.    The risk of unintended trigger actuation was that it could kill someone.

163.    The United States Army only agreed to the purchase of the P320 after Sig Sauer committed to designing an external manual safety for every military gun sold.

164.    Sig Sauer acknowledged that the presence of an engaged manual safety prevents and/or reduces the probability of unintended discharge.

165.    Despite this, Sig Sauer continued to sell the P320 without any external safeties to the public and law enforcement agencies, despite the known and unreasonable risk of unintended discharged posed by the P320's unique design.

166.    In 2016 Sig Sauer was aware of multiple incidents in which the P320 discharged due to unintended trigger actuation—a known risk from the FMECA analysis.

167.    At no time did Sig Sauer require that each P320 include at least one external safety.

168.    Sig Sauer represented to the military that its P320 design decreased the chances of unintended discharges from unintended trigger actuation.

169.    The only design feature of the P320 that decreased the chances of unintended discharges from unintended trigger actuations was the inclusion of a thumb safety for military versions.

170.    The thumb safety is not even an option for almost 90 percent of Sig Sauer P320 models.

171. Indeed, it continues to sell P320's today with no external safeties to consumers, even when Sig Sauer knew of the unreasonable risks and danger associated with unintended discharges due to the P320's design for those guns without external safeties.

## Prior Incidents

172. Sig Sauer knows of over 350 prior incidents unintended discharges with the P320.

173. There are hundreds of incidents that Sig Sauer first discovered by way of a legal letter or lawsuit directed towards it.

174. Without these legal letters or lawsuits, Sig Sauer had no other prior notice of these incidents.

175. Sig Sauer's incident tracking system is woefully deficient and does not capture the full extent of P320 unintended discharges.

176. Sig Sauer has never made another pistol with the rate or frequency of unintended discharges as the P320.

177. Sig Sauer's director of law enforcement sales, Matt Farkas, testified that Sig Sauer has seen more reports of unintended discharges from the P320 than any other gun sold by Sig Sauer.  Matt Farkas Dep., *Powers v. Sig Sauer*, 73:10-17.

178. Farkas confirmed that he did not recall ever seeing a documented report of an unintended discharge from a law enforcement officer using the Sig Sauer P220, P226, P229, or P365.  Matt Farkas Dep., *Cole v. Sig Sauer*, 80:13 – 81:19.

179. The below list is a small sample of P320 unintended discharges.

180. In February 2016, a fully-holstered P320 discharged in its holster without the user touching the gun in Roscommon, Michigan, when the officer moved to exit the vehicle during a snowstorm.   The incident was captured on the Officer's body-worn camera.

181.    Sig Sauer has known about the risk to users of the P320 discharging in its holster without the user touching the gun since at least February 2016.

182.    Despite its knowledge of over 400 incidents (and likely multiples more) of the P320 discharging without the user's intent, it has not changed the design of the gun.

183.    Some of the unintended discharges experienced by P320 users were captured on video, proving that their P320 discharged without an intentional trigger pull.

184.    On March 13, 2019, a Galveston County Sheriff, Officer John Bocquet's P320 discharged while his finger is outside of the trigger guard the entire time.  The discharge incident is caught on video and the screen shots in the moments before and after the discharge are identified below.



185.    On August 3, 2021, in St. Clair, Minnesota, Officer Robert Greene was adjusting his P320 with his trigger finger clearly visible on the slide of his gun and <u>not</u> on the trigger, when his P320 discharged.

 

186.    On March 28, 2022, Houston, Texas, Police Sergeant Marvin Reyes's P320 discharged from its holster while he was entering his car.

187.    Sergeant Reyes' incident was captured on video, which unmistakably shows that Sergeant Reyes's hands were reaching into his truck and not near his holstered P320 at the time it discharged visible below.



*Officer Marvin Reyes, Houston, TX*

*P320 discharging in its holster*

188.    On May 4, 2022, Detective David Cole of the Somerset County, Maine, Sheriff's Department was walking to his truck after serving a search warrant when his P320 that was secured in its holster discharged into his right leg.

189.    Body camera footage immediately after his discharge showed his gun was fully holstered at the time (see below).

 

*Officer David Cole, Piscataquis, ME*

190.    The Somerset County Sheriff's Office banned that P320 afterwards.

191.    On July 24, 2023, Officer Daniel Witts P320 discharged while in its holster without him touching the gun as his arms were wrapped around a suspect's legs.

192.    This incident was also captured on security camera and body camera which show his hands nowhere near the gun at the time of discharge.



***Officer Daniel Witts, Montville, CT***
***P320 discharging in its holster***

193.    On May 9, 2024, in La Grange, Texas, Officer Currington was shot by his holstered

P320 duty pistol which pierced his leg and caused him to nearly bleed to death.





194.    Sig Sauer is aware of many, many other claims of unintended discharges involving the P320 beyond those identified above.

195.    As of the date this Complaint, Sig Sauer has been aware of over 350 reports or claims of P320 unintended discharges.

196.    As of the date this Complaint, Sig Sauer has been aware of claims that P320 unintended discharges have killed users.

**Sig Sauer's Failure to Warn Users of the Danger**

197.    In its "Safety Without Compromise" marketing materials for the P320, Sig Sauer promises:



SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

198.    Despite this express representation, which Sig Sauer has made for the last several years to the present, the weapon lacks industry-standard safety features and has fired without the user deliberately pulling the trigger many, at least hundreds and likely thousands of times.

199.    Defendant, Sig Sauer, had knowledge long before the sales of the P320's used by Plaintiffs that the P320 - its first ever striker-fired pistol - was capable of firing unintentionally due to defective components and/or the lack of necessary safety features, including but not limited to: a manual safety, a tabbed trigger safety, a de-cocker and/or a grip safety.

200.    Sig Sauer is aware that the Sig Sauer P320 is capable of firing without a full trigger pull.

201. Sig Sauer is aware that the Sig Sauer P320 is capable of firing without the trigger's firing "wall" being cleared or passed.

202. For many years since the weapon was first introduced to the market in 2014, Sig Sauer has wantonly failed to recall the P320 despite knowing of scores of grievous wounds inflicted upon users and bystanders.

203. For years before the subject incidents giving rise to this action, Sig Sauer expressly represented that the weapon will not fire unless the user wants it to: "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



204. Many U.S. law enforcement agencies, local police departments, military personnel at a commander's discretion, and private owners routinely carry pistols with a chambered round.

205. Sig Sauer knew at all relevant times that its customers routinely carry P320s with a chambered round.

206. Sig Sauer knew at all relevant times that many law enforcement departments, including those that carry P320s, mandate that pistols be carried with a chambered round.

207.    Sig Sauer has sold P320s to law enforcement departments that it has known, prior to the sale, require employees to carry with a chambered round.

208.    Sig Sauer advertises that users can carry the P320 with a round chambered by annotating the P320's capacity in various configurations as "10 + 1," "12 + 1," etc.

209.    The "+ 1" represents a chambered round.

210.    Since the P320's manufacture and distribution into the stream of commerce, Sig Sauer has expressly represented that the weapon possessed a "robust safety system":



211.    Indeed, Sig Sauer originally manufactured the P320 to include a tabbed trigger safety as an optional external safety for the P320.

212.    Despite their representations, Sig Sauer never made a tabbed trigger safety, or any trigger safety available as an option for the P320.

213.    In fact, Sig Sauer's original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

214.    When Sig Sauer shipped P320's to dealers for sale to civilian consumers, Sig Sauer knew or should have known; a.) that the weapon was defective in its design and unreasonably

dangerous for its ordinary uses, intended uses, and all other foreseeable uses; and b.) that unintended discharges could occur in the ordinary course of using the weapon, including when the pistol is holstered.

215.    The injuries suffered by Plaintiffs, and harm caused to many others, were the foreseeable results outlined in Sig Sauer's own failure modes and effects criticality analysis ("FMECA") performed by Sig Sauer for both its internal use and analysis, and for the United States Military in or around late 2016 or early 2017.

216.    Defendant was on notice of the risks of the P320's design since at least 2016.

**<u>Objective Evidence of the P320's Defective Design</u>**

217.    Multiple law enforcement agencies have experienced a substantial increase in unintended discharge after issuing the P320 to its officers.

218.    The Department of Immigration and Customs Enforcement ("ICE") switch its duty pistol from the Glock, that included a tabbed trigger safety, to the P320 which does not, and almost immediately noticed a dramatic increase in unintended discharges among the same suer population.

219.    ICE's circulated an internal memo titled "Increase in ICE Unintentional Discharges" and noted that the results of its research indicated "since January 2017, most of the UDs [unintended discharge] occurred with the Sig P320, which is a weapon that has only been approved for use within the last 18 months.

220.    The ICE Memorandum notes a significant increase in unintended discharges following the introduction of the P320 when switching from the Glock.

221.    ICE produced an additional list of discharges between December 2020 and November 2022 showing 27 confirmed unintentional discharges involving a P320 and 11 unintentional discharges involving an "unknown" weapon.

222.    Comparing the seven combined unintended discharges in the two years prior to ICE's introduction of the P320 to the 26-39 in the 23-month span included in ICE's data most recent data production shows *the P320 is 3.8-5.5x more prone to unintended discharges than the tabbed trigger-equipped Glock*.[1]

223.    Cambridge Police Department officer Joseph DeSimone testified in the *Desrosiers v. Sig Sauer* matter that he did not recall a single unintended discharge among CPD officers from 1991 until Cambridge switched to the P320 in September 2018.[2]

224.    In 2019 alone, there were at least three unintended discharges by CPD officers using the P320.

225.    The Puerto Rico Police department responded to a subpoena in another matter involving an unintended discharge with a Sig Sauer P320 and provided all known unintended discharges from 2020 – March 2024.

226.    The Puerto Rico Police reported 84 unintended discharges within that time period: 77 were from pistols, including the Glock, Smith and Wesson M&P, and the Sig Sauer P320. *Id.*

---

[1]    This calculation assumes all five incidents referenced in the ICE memorandum 2017 involved a Glock, which may not be the case. In the event any of the 2017 incidents involved another firearm, the relative number of incidents involving a P320 would be even greater.

[2]    Prior to the P320, the CPD used the Sig Sauer P228 and P229. Both pistols are hammer-fired guns with the first trigger-pull being a double-action, meaning it both cocks and releases the hammer. This results in a much heavier trigger pull.

227.    Of those 77 unintended discharges with pistols, 68 were associated with the Sig Sauer P320.[3]

228.    In response to the dramatic increase in unintended discharges experienced by law enforcement agencies nationwide, multiple agencies have switched out of the P320 or banned the gun entirely.[4]

229.    The Pennsylvania State Police banned the P320 due to safety concerns and does not allow its officers to carry the P320 even off-duty.

230.    Federal, state, and local law enforcement agencies have either banned the P320 or have discontinued its use, including: The Milwaukee Police Department, Wyoming Highway Patrol,, Southeastern Pennsylvania Transit Authority Police, the Chicago Police Department, Pennsylvania State Police Department, Cambridge Police Department, the Denver Police Department, the Houston Police Department, the Austin Police Department, the Somerset County Sheriff's Office (ME), the Philipsburg Police Department (NJ), and many others.

---

[3]    Chris Meyer, Sig Sauer's corporate designee, could not confirm whether this addition 68 unintended discharge in a single law enforcement agency was included in the over 350 incident Sig Sauer was aware of.

[4] *Milwaukee police will stop using gun that keeps going off by mistake*. VICE. (November 3, 2022). Retrieved February 23, 2024, from https://www.vice.com/en/article/epzkkj/milwaukee-police-sig-sauer-pistol ; *WYO Highway Patrol got rid of Sig Sauer pistols after Trooper's gun discharged accidentally* Cowboy State Daily. (December 7, 2022). Retrieved February 23, 2024, from https://cowboystatedaily.com/2022/12/07/wyo-highway-patrol-got-rid-of-sig-sauer-pistols-after-troopers-gun-discharged-accidentally/ ; *SEPTA Transit Police replace SIG Sauer pistols after service weapon fires while in holster*. PhillyVoice. (September 12, 2019). Retrieved February 23, 2024, from https://www.phillyvoice.com/septa-transit-police-sig-sauer-p320-pistols-gun-accidentally-fires-holster-philadelphia/ ; *Wis. FOP recommends police across the state stop using the Sig Sauer P320*. WISN. (September 14, 2022) Retrieved February 23, 2024, from https://www.wisn.com/article/wis-fop-recommends-police-across-the-state-stop-using-sig-sauer-p320/41202525.

231.    On November 21, 2024, the National Fraternal Order of Police sent a public letter to Ron Cohen, the CEO of Sig Sauer, "to address a pressing concern regarding the reported safety issues with the SIG Sauer P320 firearm."

232.    In February 2025, the Washington State Criminal Justice Training Commission assembled a work-group and published a report on the P320.

233.    The workgroup was initiated in response to an October 9, 2024 unintended discharge where, during a training session a "[r]ecruit drew their firearm (Sig Sauer P320) to engage the course of fire [and] their gun immediately self-discharged."[5]

234.    Based on the WCJTC's investigation, there was "an abundance of allegations of un-commanded discharges occurring around the country and world **attributed nearly exclusively to the Sig Sauer P320**, M17, and M18 platforms." *Id.,* p. 8.

235.    Sig Sauer still sells the P320 to law enforcement agencies with its short displacement trigger, its single-action design, and no external safeties.

236.    As of the date this Complaint, Sig Sauer has been aware of more unintended discharges of Sig Sauer P320s than any other gun it makes since the time the P320 first went to market.

237.    The problem of unintended discharges with the P320 has shown no signs of abating, but Sig Sauer refuses to recall the gun and/or address and correct the defective design.

238.    Firearms are consumer product exempt from the Consumer Product Safety Commission.

239.    The CPSC cannot require firearms manufacturers to recall defective guns.

_____

[5]    The report also identified three other Washington police agencies who have banned the P320 (Vancouver Police Department,  Clark County Sheriff's Office, and Pierce County Sheriff).

240.    The decision to issue a mandatory recall is left entirely to Sig Sauer's discretion.

241.    The decision to redesign the P320 to include necessary, industry-wide safeties that the P320 lacks, is left entirely to Sig Sauer's discretion.

242.    To date, Sig Sauer has never issued a mandatory recall of the P320 and continues to sell the P320, putting profits above the health and safety of its users.

243.    Our firm's clients desperately plead with Sig Sauer to recall this weapon before more victims are injured.

## PLAINTIFFS' INCIDENTS

### Gregory Blade

244.    Prior to January 30, 2024, Gregory Blade had extensive firearms training and experience through his 25 years in law enforcement.

245.    Prior to January 30, 2024, Blade purchased a P320 for personal use.

246.    On January 30, 2024, in Encorse, Michigan, Blade's P320 suddenly and unexpectedly discharged as he began removing the pistol from its holster.

247.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

248.    The bullet struck Blade in his right thigh, and traveled down his leg, and came to rest in his right calf, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

249.    While the full extent of the physical damage to Blade's leg is not yet known, he has had (and it is likely that he will have) trouble running, walking, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

250.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Blade was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Blade has in the past and is reasonably likely to require medicines, medical care and treatment.  Blade has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Blade has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Blade has in the past and may in the future continue to be disabled from performing his usual duties and avocations, all to Blade's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Blade, who has received substantial and ongoing treatments and medicines.

**Jeremy Bluto**

251.    Prior to March 28, 2024, Jeremy Bluto had undergone extensive firearms training in his capacity as a Special Agent for ICE/HSI, and through more than 21 years in law enforcement.

252.    Bluto was a member of the Border Patrol Tactical Unit (BORTAC) and the HSI Special Response Team, which require substantial firearms training and advanced firearms training beyond that of a special agent.

253.    Prior to March 28, 2024, Bluto was issued a P320 by ICE/HSI.

254.     On March 28, 2024, in Galena, Missouri, Bluto's P320 suddenly and unexpectedly discharged after he holstered the pistol while participating in quarterly training drills.

255.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

256.    The bullet struck Bluto below his right knee, and traveled down his leg before exiting, leaving shrapnel in his leg, and causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

257.    While the full extent of the physical damage to Bluto's leg is not yet known, he has had (and it is likely that he will have) trouble running, walking, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

258.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Bluto was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Bluto has in the past and is reasonably likely to require medicines, medical care and treatment.  Bluto has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Bluto has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Bluto has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Bluto's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Bluto, who has received substantial and ongoing treatments and medicines.

**Lydell Boanes**

259.    Prior to May 11, 2025, Lydell Boanes had extensive firearms experience as a gun owner.

260.    Prior to May 11, 2025, Boanes purchased a P320 for personal use.

261.    On May 11, 2025, Boanes' P320 suddenly and unexpectedly discharged when he holstered the pistol.

262.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

263.    The bullet struck Boanes in his right thigh, causing substantial injury, maceration of tissue, blood loss, bone fractures, and nerve damage, along with severe emotional trauma.

264.    While the full extent of the physical damage to Boanes' leg and foot is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

265.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Boanes was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Boanes has in the past and is reasonably likely to require medicines, medical care and treatment.  Boanes has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Boanes has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Boanes has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Boanes' great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Boanes, who has received substantial and ongoing treatments and medicines.

**Damone Bowles**

266.    Prior to September 4, 2025, Damone Bowles had extensive firearms training and experience through his 25 years in law enforcement.

267.    Prior to, and on September 4, 2025, Bowles was serving as a Police Officer for the New Jersey Department of Corrections.

268.    Prior to September 4, 2025, Bowles was issued a P320 by the New Jersey Department of Corrections.

269.    On September 4, 2025, in Howell, New Jersey, Bowles' holstered P320 suddenly and unexpectedly discharged when he attempted to remove the holstered pistol from his duty belt.

270.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

271.    The bullet struck Bowles in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

272.    While the full extent of the physical damage to Bowles' leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

273.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Bowles was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Bowles has in the past and is reasonably likely to require medicines, medical care and treatment.  Bowles has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Bowles has in

the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Bowles has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Bowles' great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Bowles, who has received substantial and ongoing treatments and medicines.

**George Bravo**

274. Prior to January 31, 2024, Bravo had extensive experience with firearms as a gun owner.

275. Prior to January 31, 2024, Bravo purchased a P320 for personal use.

276. On January 31, 2024, in San Antonio, Texas, Bravo's P320 suddenly and unexpectedly discharged while holstered.

277. Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

278. The bullet struck Bravo in his right thigh and tunneled down his leg, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

279. While the full extent of the physical damage to Bravo's leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

280. As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Bravo was forced to suffer

serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Bravo has in the past and is reasonably likely to require medicines, medical care and treatment. Bravo has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Bravo has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Bravo has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Bravo's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Bravo, who has received substantial treatments and medicines.

## Keith Buinauskas

281.    Prior to July 7, 2025, Keith Buinauskas had extensive firearms training and experience in his capacity as a Sergeant for the Oxford Police Department, where he worked for over 30 years.

282.    Prior to July 7, 2025, Buinauskas was issued a P320 by the Oxford Police Department.

283.    On July 7, 2025, in Oxford Connecticut, Buinauskas' holstered P320 suddenly and unexpectedly discharged.

284.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

285.    The bullet struck Buinauskas in his right foot, and exited through the bottom of his foot, causing substantial injury, nerve damage, maceration of tissue, and blood loss, along with severe emotional trauma.

286.     While the full extent of the physical damage to Buinauskas' foot is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

287.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Buinauskas was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Buinauskas has in the past and is reasonably likely to require medicines, medical care and treatment.  Buinauskas has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Buinauskas has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Buinauskas has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Buinauskas' great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Buinauskas, who has received substantial and ongoing treatments and medicines.

**Thomas Burris**

288.     Prior to February 4, 2025, Thomas Burris had extensive firearms training and experience through his 20 years in law enforcement.

289.     Prior to February 4, 2025, Burris purchased a P320 for personal use.

290.     On February 4, 2025, in his home, Burris' P320 suddenly and unexpectedly discharged as he attempted to remove the pistol and holster, together, from his waistband.

291.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

292.    The bullet struck Burris in his left thigh and hit his femoral artery, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

293.    While the full extent of the physical damage to Burris' body is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

294.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Burris was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Burris has in the past and is reasonably likely to require medicines, medical care and treatment.  Burris has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Burris has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Burris has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Burris' great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Burris, who has received substantial and ongoing treatments and medicines.

**Frederick Diaz**

295.    Prior to March 18, 2025, Frederick Diaz had undergone extensive firearms training in his capacity as a Special Agent for ICE, and through his 25 years in law enforcement.

296.    Prior to March 18, 2025, Diaz was issued a P320 by ICE.

297.    On March 18, 2025, in Clayton, California, Diaz's holstered P320 suddenly and unexpectedly discharged while participating in firearms training pursuant to his duties as a Special Agent for ICE.

298.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

299.    The bullet struck Diaz in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

300.    While the full extent of the physical damage to Diaz's leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, sitting or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

301.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Diaz was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Diaz has in the past and is reasonably likely to require medicines, medical care and treatment. Diaz has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Diaz has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Diaz has in the past and may in the future continue to be disabled from performing his

usual duties, occupations, and avocations, all to Diaz's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Diaz, who has received substantial and ongoing treatments and medicines.

**Stanley Edrington Jr.**

302.    Prior to September 9, 2024, Stanley Edrington Jr. had extensive training and experience with firearms through his experience serving in the United States Navy.

303.    Prior to September 9, 2024, Edrington purchased a P320 for personal use.

304.    On September 9, 2024, in Greensburg, Indiana, Edrington's P320 suddenly and unexpectedly discharged when he picked up his pistol.

305.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

306.    The bullet struck Edrington in his left index finger, causing substantial injury and requiring amputation, along with severe emotional trauma.

307.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Edrington was forced to suffer serious, disabling, and permanent injuries and emotional distress.   Edrington has required medicines, medical care and treatment. Edrington has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Edrington has in the past and may in the future continue to suffer psychological and emotional anguish.  Edrington has in the past and may in the future continue to be disabled from performing his usual duties, and avocations, all to Edrington's great loss and detriment. The incident has

resulted in substantial and permanent physical harm and related trauma to Edrington, who has received substantial treatments and medicines.

## Osvaldo Diaz-Fernandez

308.    Prior to October 5, 2024, Osvaldo Diaz-Fernandez had extensive firearms experience as a gun owner.

309.    Prior to October 5, 2024, Diaz-Fernandez purchased a P320 for personal use.

310.    On October 5, 2024, Diaz-Fernandez's holstered P320 suddenly and unexpectedly discharged.

311.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

312.    The bullet struck Diaz-Fernandez in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

313.    While the full extent of the physical damage to Diaz-Fernandez's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, sitting or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Diaz-Fernandez was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Diaz-Fernandez has in the past and is reasonably likely to require medicines, medical care and treatment. Diaz-Fernandez has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Diaz-

Fernandez has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Diaz-Fernandez has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Diaz-Fernandez's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Diaz-Fernandez, who has received substantial and ongoing treatments and medicines.

**Douglas Fore**

314.    Prior to November 1, 2025,  Douglas Fore had extensive firearms experience and training as a gun owner.

315.    Prior to November 1, 2025, Fore purchased a P320 for personal use.

316.    On November 1, 2025, in  his home, Fore's P320 suddenly and unexpectedly discharged as he was reholstering his pistol.

317.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

318.    The bullet struck Fore in his right hip, traveling through his leg and exited through the back of his right thigh, causing substantial injury, maceration of tissue, blood loss, nerve damage, along with severe emotional trauma.

319.    While the full extent of the physical damage to Fore's leg is not yet known, he has had trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form.

320.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Fore was forced to suffer

serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Fore has in the past and is reasonably likely to require medicines, medical care and treatment. Fore has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Fore has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Fore has in the past and may in the future continue to be hindered from performing his usual duties, occupations, and avocations, all to Fore's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Fore, who has received substantial and ongoing treatments and medicines

**Samuel Kevin Fowler**

321.    Prior to December 21, 2024, Samuel Kevin Fowler had undergone firearms training as a gun owner and as a Personal Protective Officer licensed through the Texas Department of Public Safety.

322.    Prior to December 21, 2024, Fowler purchased a P320 for use as a duty pistol in connection with his duties as a Personal Protective Officer and member of the Safety Team at Lanes Chapel Methodist Church.

323.    On December 21, 2024, in Chandler, Texas, Fowler was participating in quarterly training in connection with his duties as a Personal Protective Officer when his P320 suddenly and unexpectedly discharged after holstering the pistol.

324.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

325.    The bullet struck Fowler in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

326.    While the full extent of the physical damage to Fowler's leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, or standing as he had before the incident. Fowler also experiences psychological limitations that prevent his return to his pre-incident form and may be permanent in nature.

327.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Fowler was forced to suffer serious, disabling physical injuries and psychological and emotional distress, the full extent of which has yet to be determined.  Fowler has in the past and is reasonably likely to require medicines, medical care and treatment. Fowler has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Fowler has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Fowler has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Fowler's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Fowler, who has received substantial and ongoing treatments and medicines.


**Jesse Frisco**

328.    Prior to January 25, 2025, Jesse Frisco had extensive firearms training and experience working for the  Texas Federal Bureau of Prisons and as a competitive shooter.

329.    Prior to January 25, 2025, Frisco purchased a P320 for personal use.

330.    On January 25, 2025, in Texas, Frisco's P320 suddenly and unexpectedly discharged after he holstered the pistol during training drills at the gun range.

331.    Frisco's hand was not on the pistol when it discharged.

332.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

333.    The bullet struck Frisco in his right thigh, entered through his right knee and traveled down his leg exiting from his calf, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

334.    While the full extent of the physical damage to Frisco's leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

335.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Frisco was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Frisco has in the past and is reasonably likely to require medicines, medical care and treatment. Frisco has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Frisco has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Frisco has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Frisco's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Frisco, who has received substantial and ongoing treatments and medicines.

**Yevgeny Gershman**

336.    Prior to March 21, 2024, Yevgeny Gershman had extensive firearms training and experience through his military and law enforcement career spanning approximately 19 years.

337.    Prior to March 21, 2024, Gershman was issued a P320 in connection with his duties as a Special Agent for Homeland Security Investigations.

338.    On March 21, 2024, in New Hampton, New York, Gershman was participating in training drills in connection with his duties as a Special Agent for Homeland Security Investigations when his fully holstered P320 suddenly and unexpectedly discharged as he began to remove the pistol from its holster.

339.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

340.    The bullet struck Gershman in his right hip, causing substantial injury, and blood loss, along with severe emotional trauma.

341.    While the full extent of the physical damage to Gershman's hip is not yet known, he has had trouble running, sitting, or standing, and training as he had before the incident, and will likely never be able to return to his pre-incident form.

342.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Gershman was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Gershman has in the past and is reasonably likely to require medicines, medical care and treatment.  Gershman has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Gershman has in the past and may in the future continue to suffer agonizing aches, pains, and

psychological and emotional anguish. Gershman has in the past and may in the future continue to be hindered from performing his usual duties, occupations, and avocations, all to Gershman's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Gershman, who has received substantial and ongoing treatments and medicines.

**Andrew Gross**

343.    Prior to March 11, 2024, Andrew Gross had extensive firearms experience and training as a Sergeant for the Lake County Sherriff's Office in Leadville, Colorado, as well as through his 10 years in private security, and 15 years as a firearms instructor.

344.    On March 11, 2024, Gross was issued a P320 by the Lake County Sherrif's Office.

345.    On March 11, 2024, as Gross was placing his personal items in his car, he raised a shoulder bag with his left hand, and his holstered P320 suddenly and unexpectedly discharged.

346.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

347.    The bullet struck Gross in his left leg, causing substantial injury, maceration of tissue, bone fractures, blood loss, and nerve damage, along with severe emotional trauma.

348.    While the full extent of the physical damage to Gross' leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

349.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Gross was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet

to be determined.  Gross has in the past and is reasonably likely to require medicines, medical care and treatment.  Gross has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Gross has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Gross has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Gross great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Gross, who has received substantial and ongoing treatments and medicines.

**Corey Hamilton**

350.    Prior to May 26, 2025, Corey Hamilton had firearms training and experience as a gun owner.

351.    On May 26, 2025, in Massena, New York, Hamilton was at a shooting range when the holstered P320 he was using suddenly and unexpectedly discharged.

352.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

353.    The bullet struck Hamilton in his right leg below his knee and traveled down his leg, coming to rest in his ankle, causing substantial injury, bone fracture, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

354.    While the full extent of the physical damage to Hamilton's leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

355.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Hamilton was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Hamilton has in the past and is reasonably likely to require medicines, medical care and treatment. Hamilton has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Hamilton has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Hamilton has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Hamilton's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Hamilton, who has received substantial and ongoing treatments and medicines.

**William Keyes and Michael Anderson**

356.    Prior to October 14, 2024, William Keyes had firearms training and experience as a gunowner.

357.    Prior to October 14, 2024, Keyes purchased a P320 for personal use.

358.    On October 14, 2024, in Routt County, Colorado, Keyes was on a hunting trip with his friend, Plaintiff Michael Anderson.

359.    On that day, Keyes' P320 suddenly and unexpectedly discharged after he holstered the pistol.

360.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

361.    The bullet struck Keyes in his right leg, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

362.    While the full extent of the physical damage to Keyes' leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, sitting or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

363.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Keyes was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Keyes has in the past and is reasonably likely to require medicines, medical care and treatment. Keyes has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Keyes has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Keyes has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Keyes's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Keyes, who has received substantial and ongoing treatments and medicines.

364.    Plaintiff Michael Anderson witnessed the unintentional discharge that seriously injured Plaintiff Keyes, and was within the zone of danger. As a result, Plaintiff Michael Anderson has suffered, and continues to suffer, from severe emotional distress, and other psychological and mental injuries.

**Richard Kostner**

365.    Prior to January 15, 2025, Richard Kostner had firearms experience and had undergone firearms training as a gun owner and competitive shooter.

366.    Prior to January 15, 2025, Kostner purchased a P320 for personal use.

367.    On January 15, 2025, in Lincoln, Nebraska, Kostner was participating in a shooting competition when his holstered P320 suddenly and unexpectedly discharged.

368.    Kostner's hand was not on the pistol when it unintentionally discharged.

369.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

370.    The bullet struck Kostner in his right foot, exiting through the bottom of his foot near his right heel, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

371.    While the full extent of the physical damage to Kostner's right foot is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

372.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Kostner was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Kostner has in the past and is reasonably likely to require medicines, medical care and treatment.  Kostner has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Kostner has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and

emotional anguish. Kostner has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Kostner's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Kostner, who has received substantial and ongoing treatments and medicines.

**Phillip Lukasick**

373.    Prior to February 26, 2025, Phillip Lukasick had firearms experience as a gun owner.

374.    Prior to February 26, 2025, Lukasick purchased a P320 for personal use.

375.    On February 26, 2025, in Murfreesboro, Tennessee, Lukasick's P320 suddenly and unexpectedly discharged as he was holstering the pistol.

376.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

377.    The bullet struck Lukasick in his right thigh, traveled down his leg, and exited near his right knee, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

378.    While the full extent of the physical damage to Lukasick's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

379.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Lukasick was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet

to be determined. Lukasick has in the past and is reasonably likely to require medicines, medical care and treatment. Lukasick has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Lukasick has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Lukasick has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Lukasick's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Lukasick, who has received substantial and ongoing treatments and medicines.

**Shawn Micciche**

380.    Prior to April 10, 2024, Shawn Micciche had undergone extensive firearms training as a Deputy Sheriff.

381.    On April 10, 2024, at the Naples Jail Center in Naples, Florida, Officer Micciche was removing a P320 from a locker to return to a visiting Federal Agent, when the pistol suddenly and unexpectedly discharged.

382.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

383.    The bullet struck Micciche in his right hand, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

384.    While the full extent of the physical damage to Micciche's right hand is not yet known, he has had (and it is likely that he will have) trouble grasping and using his hand as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

385.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Micciche was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Micciche has in the past and is reasonably likely to require medicines, medical care and treatment.  Micciche has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Micciche has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Micciche has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Micciche's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Micciche, who has received substantial and ongoing treatments and medicines.

**Billy Olivarria**

386.    Prior to February 28, 2025, Billy Olivarria had undergone extensive firearms training in his capacity as an officer for ICE.

387.    Prior to February 28, 2025, Olivarria was issued a P320 by ICE.

388.    On February 28, 2025, in Florence, Arizona, Olivarria's P320 suddenly and unexpectedly discharged as he was unholstering his pistol during firearms training with ICE.

389.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

390.    The bullet struck Olivarria in his right thigh, traveled down his leg, and came to rest in his calf, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

391.    While the full extent of the physical damage to Olivarria's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

392.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Olivarria was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Olivarria has in the past and is reasonably likely to require medicines, medical care and treatment.  Olivarria has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Olivarria has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Olivarria has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Olivarria's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Olivarria, who has received substantial and ongoing treatments and medicines.

**Albert Rivera Jr.**

393.    Prior to November 27, 2023, Albert Rivera Jr. had undergone extensive firearms training in his capacity as a police officer.

394.    Prior to November 27, 2023, Rivera was issued a P320 by the Stockton Unified School District Police Department in Stockton, California.

395.    On November 27, 2023, in his home, Rivera's P320 suddenly and unexpectedly discharged as he was unholstering his pistol.

396.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

397.    The bullet struck Rivera in his right leg, grazed his thigh, then traveled down his leg and entered and exited through his calf, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

398.    While the full extent of the physical damage to Rivera's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

399.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Rivera was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Rivera has in the past and is reasonably likely to require medicines, medical care and treatment.  Rivera has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Rivera has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Rivera has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Rivera's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Rivera, who has received substantial and ongoing treatments and medicines.

**Christopher Russell**

400.    Prior to September 27, 2025, Christopher Russell had had undergone extensive firearms training as a gun owner.

401.    Prior to September 27, 2025, Russell purchased a P320 for personal use.

402.    On September 27, 2025, in Biloxi, Mississippi, Russell's P320 suddenly and unexpectedly discharged as he holstered his pistol.

403.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

404.    The bullet struck Russell in his right thigh, traveled down his leg, and came to rest in behind his knee, impacting both his fibula, tibia and femur, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

405.    While the full extent of the physical damage to Russell's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

406.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Russell was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Russell has in the past and is reasonably likely to require medicines, medical care and treatment. Russell has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Russell has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Russell has in the past and may in the future continue to be disabled from

performing his usual duties, occupations, and avocations, all to Russell's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Russell, who has received substantial and ongoing treatments and medicines.

## Dallas Quarrels

407.    Prior to April 9, 2025, Dallas Quarrels had undergone firearms training in his personal capacity as a gun owner and through his service in the United States Military.

408.    Prior to April 9, 2025, Quarrels purchased a P320 for personal use.

409.    On April 9, 2025, in Saginaw, Michigan, Quarrels' holstered P320 suddenly and unexpectedly discharged.

410.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

411.    The bullet struck Quarrels in his   right calf and foot, causing substantial injury, maceration of tissue, bone fractures, blood loss, and nerve damage, along with severe emotional trauma.

412.    While the full extent of the physical damage to Quarrels's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

413.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Quarrels was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Quarrels has in the past and is reasonably likely to require medicines, medical

66

care and treatment.  Quarrels has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Quarrels has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Quarrels has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Quarrels's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Quarrels, who has received substantial and ongoing treatments and medicines.

## Fletcher Schiefelbein

414.    Prior to February 14, 2025, Fletcher Schiefelbein had undergone firearms training in his personal capacity as a gun owner.

415.    Prior to February 14, 2025, Schiefelbein purchased a P320 for personal use.

416.    On February 14, 2025, in his home, Schiefelbein's holstered P320 suddenly and unexpectedly discharged after he holstered his pistol.

417.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

418.    The bullet struck Schiefelbein in his penis and exited through his right testicle, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

419.    While the full extent of the physical damage to Schiefelbein's body is not yet known, he has had (and it is likely that he will have) trouble with fertility, erectile dysfunction, walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

420. As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Schiefelbein was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Schiefelbein has in the past and is reasonably likely to require medicines, medical care and treatment. Schiefelbein has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Schiefelbein has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Schiefelbein has in the past and may in the future continue to experience problems related to fertility and other erectile disfunction. Schiefelbein has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Schiefelbein's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Schiefelbein, who has received substantial and ongoing treatments and medicines.

**Joshua Southard**

421. Prior to March 17, 2025, Joshua Southard had extensive firearms training and experience through his 14 years in law enforcement.

422. Prior to March 17, 2025, Southard was issued a P320 by ICE.

423. On March 17, 2025, in Fort Meade, Maryland, Southard's P320 suddenly and unexpectedly discharged as he was holstering the pistol.

424. Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

68

425.    The bullet struck Southard in his right thigh, causing substantial injury, maceration of tissue, and blood loss, along with severe emotional trauma.

426.    While the full extent of the physical damage to Southard's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

427.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Southard was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Southard has in the past and is reasonably likely to require medicines, medical care and treatment. Southard has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Southard has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Southard has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Southard's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Southard, who has received substantial and ongoing treatments and medicines.


**Robin Tarbutton-Woodward**

428.    Prior to September 21, 2025, Robin Tarbutton-Woodward had firearms experience as a gun owner

429.    Prior to September 21, 2025, Tarbutton-Woodward received a P320 as a wedding present from her Husband for personal use.

430.     On September 21, 2025, in Okeechobee, Florida, during a firearms training class, Tarbutton-Woodward's holstered P320 suddenly and unexpectedly discharged after she holstered her pistol.

431.     Plaintiff's finger never touched the face of the P320's trigger and she did not intend to fire the weapon.

432.     The bullet struck Tarbutton-Woodward in her right foot, on the inside of the right heel, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

433.     While the full extent of the physical damage to Tarbutton-Woodward's right leg is not yet known, she has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as she had before the incident, and will likely never be able to return to her pre-incident form as a result of diminished physical capacity.

434.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Tarbutton-Woodward was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Tarbutton-Woodward has in the past and is reasonably likely to require medicines, medical care and treatment.  Tarbutton-Woodward has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Tarbutton-Woodward has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Tarbutton-Woodward has in the past and may in the future continue to be disabled from performing her usual duties, occupations, and avocations, all to Tarbutton-Woodward's great loss and detriment. The incident

has resulted in substantial physical harm and related trauma to Tarbutton-Woodward, who has received substantial and ongoing treatments and medicines.

**Raphael Velez**

435.    Prior to May 20, 2024, Raphael Velez had extensive firearms training and experience as a gunowner and Firearms Instructor for the National Rifle Association and United State Concealed Carry Association.

436.    Prior to May 20, 2024, Velez purchased a P320 for personal use.

437.    On May 20, 2024, in Mary Esther, Florida, Velez's P320 was in a tactical fanny pack, which he kept in a tactical backpack.

438.    On that date, Velez's P320 suddenly and unexpectedly discharged from within the tactical fanny pack as he lifted his tactical backpack.

439.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

440.    The bullet struck Velez in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

441.    While the full extent of the physical damage to Velez's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

442.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Velez was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Velez has in the past and is reasonably likely to require medicines, medical care

and treatment. Velez has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Velez has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Velez has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Velez's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Velez, who has received substantial and ongoing treatments and medicines.

**Christopher West**

443.    Prior to February 20, 2025, Christopher West had extensive firearms training and experience as a gunowner.

444.    Prior to February 20, 2025, West purchased a P320 for personal use.

445.    On February 20, 2025, West was taking firearms training class at Saddle River Range in Conroe, Texas, when his P320 suddenly and unexpectedly discharged after he holstered the pistol.

446.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

447.    The bullet struck West in his right calf, traveled down his leg, and came to rest in his right heel, causing substantial injury, maceration of tissue, bone fracture, blood loss, and nerve damage, along with severe emotional trauma.

448.    While the full extent of the physical damage to West's right leg and foot is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

449.    At all relevant times, West's wife, Plaintiff Natalie West was and remains functionally blind, and relies on her husband for daily support, care and assistance. Due to his injuries, husband- Plaintiff West is no longer able to provide his wife the same support, care and assistance as he had before the incident.

450.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, West was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  West has in the past and is reasonably likely to require medicines, medical care and treatment.  West has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. West has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  West  has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to West's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to West, who has received substantial and ongoing treatments and medicines.


**Adam Wilson**

451.    Prior to November 17, 2024, Adam Wilson had extensive firearms training and experience as a gunowner.

452.    Prior to November 17, 2024, Wilson purchased a P320 for personal use.

453.    On November 17, 2024, in Rural Retreat, Virginia, Wilson's holstered P320 suddenly and unexpectedly discharged.

454.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

455.    The bullet struck Wilson in or near his right hip, traveled down his leg, and exited from his inner right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

456.    While the full extent of the physical damage to Wilson's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

457.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Wilson was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Wilson has in the past and is reasonably likely to require medicines, medical care and treatment.  Wilson has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Wilson has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Wilson has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Wilson's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Wilson, who has received substantial and ongoing treatments and medicines.

**Colin Yakish**

458.    Prior to December 7, 2024, Colin Yakish had extensive firearms training and experience as a gunowner.

459.    Prior to December 7, 2024, Colin Yakish purchased a P320 for personal use.

460.    On December 7, 2024, in Zwingle, Iowa, Yakish's P320 suddenly and unexpectedly discharged as he was removing the pistol from its holster.

461.    Plaintiff's finger never touched the face of the P320's trigger and he did not intend to fire the weapon.

462.    The bullet struck Yakish below his right knee, traveled down his leg, and exited above his right ankle, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

463.    While the full extent of the physical damage to Yakish's right leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

464.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Yakish was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Yakish has in the past and is reasonably likely to require medicines, medical care and treatment.  Yakish has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Yakish has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Yakish has in the past and may in the future continue to be disabled from

performing his usual duties, occupations, and avocations, all to Yakish's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Yakish, who has received substantial and ongoing treatments and medicines.

## COUNT I – NEGLIGENCE
### GREGORY BLADE V. SIG SAUER

465.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

466.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

467.    At all relevant times, Sig Sauer owed Plaintiff the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

468.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Blade, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

469.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharge ;

iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull  as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-unintended discharges

ix.     By misrepresenting the dangers and hazards posed by the gun;

x.      By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xi.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xii.    By including a defective and improper holster in the original packaging with the gun;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

470.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

471.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

472.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the January 30, 2024, unintended discharge and Blade's resulting injuries.

473.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT II – STRICT PRODUCT LIABILITY
### GREGORY BLADE V. SIG SAUER

474.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

475.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

476.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

477.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

478.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

479.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

480.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

481.    The defective condition of the P320 caused Plaintiff's injuries.

482.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

483.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT III – BREACH OF IMPLIED WARRANTY
### GREGORY BLADE V. SIG SAUER

484.    Plaintiff re-affirms and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

485.    At all relevant times, Sig Sauer was in the business of marketing, selling, and distributing weapons, including Plaintiff's P320 pistol.

486.    Sig Sauer knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

487.     At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of Sig Sauer.

488.     Sig Sauer breached the above-referenced implied warranties as to the gun because, at the time it left Sig Sauer's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended due to Sig Sauer:

    i.   Failing to use due care in designing and manufacturing the P320's internal components and by omitting a mechanical disconnect switch to prevent or mitigate against unintended discharges;

    ii.   Failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

    iii.   Failing to make reasonable tests and/or inspections to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull;

    iv.   Negligently failing to unambiguously warn purchasers/users of the gun of said faulty conditions relating to its design and manufacture;

    v.   Failing to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun.

489.     Plaintiff, as the end user of the gun, was a person who would foreseeably be injured by Sig Sauer breaching the implied warranties referenced in this Count and Sig Sauer's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein, directly and proximately caused the subject incident on January 30, 2024, and the resulting injuries to Plaintiff.

490.     As a direct and proximate result Defendant's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein, Plaintiff suffered severe

physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future

## COUNT IV – NEGLIGENCE
## JEREMY BLUTO V. SIG SAUER

491.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

492.    At all relevant times, Sig Sauer owed Bluto the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

493.    At all relevant times, Sig Sauer owed Bluto the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

494.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Bluto, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

495.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent discharges or mitigate against unintended discharges;

    iv.    By failing to issue a mandatory recall of the P320 Sig Sauer had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

    vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Bluto, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

    vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

    viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.     Other negligent acts and omissions to be developed in the course of discovery.

496.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

497.    The gun's defective condition was not visible, and Bluto was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

498.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the March 28, 2024, unintended discharge and Bluto's resultant injuries.

499.    As a direct and proximate result of the negligence set forth in this Count, Bluto suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Bluto will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT V - STRICT PRODUCT LIABILITY
### JEREMY BLUTO V. SIG SAUER

500.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

501.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

  i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

  ii.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

  iii.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

  iv.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

502.     At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

503.     The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

504.     The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

505.     The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

506.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

507.     The defective condition of the P320 caused Plaintiff's injuries.

508.     Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

509.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VI – NEGLIGENCE
### LYDELL BOANES V. SIG SAUER

510.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

511.     At all relevant times, Sig Sauer owed Boanes the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

512.     At all relevant times, Sig Sauer owed Boanes the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care,

so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

513.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Boanes, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

514.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull  as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Boanes, of said defective, hazardous and unreasonably dangerous conditions relating

to its design and manufacture, about which it knew or should
have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and
unreasonably dangerous conditions relating to the gun's
propensity to discharge without an intentional trigger pull
while in the possession of Sig Sauer, and during which times
employees, servants or agents of Sig Sauer had an
opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere
"vibration" of the gun in a conspicuous manner, such as on
its case, which could be easily understood by a consumer,
instead of relying on changing the bottom of page 25 of the
user manual for the gun after several incidents of unintended
discharges;

ix.  By including a defective and improper holster in the original
packaging with the gun;

x.  By misrepresenting the dangers and hazards posed by the
gun;

xi.  By failing to design a firearm that would be safe for all users
to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when
carried with a round in the chamber;

xiii.  By failing to incorporate safeties which were standard
among all of the P320s' competitors; and

xiv.  Other negligent acts and omissions to be developed in the
course of discovery.

515.  Sig Sauer knew, or should have known, that exposing users to the dangerous and

defective and hazardous conditions existing in the gun would or could give rise to serious bodily

injuries to such users, up to and including death.

516.  The gun's defective condition was not visible, and Boanes was not capable of

realizing the dangerous condition and could not have discovered the dangerous condition even

upon performing a reasonable inspection of the same.

517.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the May 11, 2025, unintended discharge and Boanes' resultant injuries.

518.    As a direct and proximate result of the negligence set forth in this Count, Boanes suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Boanes will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VI - STRICT PRODUCT LIABILITY
### LYDELL BOANES V. SIG SAUER

519.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

520.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

     i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

521.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

522.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

523.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

524.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

525.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

526.    The defective condition of the P320 caused Plaintiff's injuries.

527.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

528.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VIII – NEGLIGENCE
### DAMONE BOWLES V. SIG SAUER

529.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

530.    At all relevant times, Sig Sauer owed Bowles the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

531.    At all relevant times, Sig Sauer owed Bowles the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

532.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Bowles, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

533.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

      ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Bowles, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

534.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

535.    The gun's defective condition was not visible, and Bowles was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

536.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the September 4, 2025, unintended discharge and Bowles' resultant injuries.

537.    As a direct and proximate result of the negligence set forth in this Count, Bowles suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Bowles will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## <u>COUNT IX - STRICT PRODUCT LIABILITY</u>
### <u>DAMONE BOWLES V. SIG SAUER</u>

538.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

539.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

540.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

541.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

542.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

543.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

544.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

545.    The defective condition of the P320 caused Plaintiff's injuries.

546.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

547.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>**COUNT X – NEGLIGENCE**</u>
**GEORGE BRAVO V. SIG SAUER**

548.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

549.    At all relevant times, Sig Sauer owed Bravo the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

550.    At all relevant times, Sig Sauer owed Bravo the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

551.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Bravo, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

552.    Sig Sauer breached the above-cited duties in various ways, including but not limited

to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharge;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Burris, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-intended discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber.

xiii. By failing to incorporate safeties which were standard among all of the P320s' competitors.

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

553.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

554.    The gun's defective condition was not visible, and Bravo was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

555.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the January 31, 2024, unintended discharge and Bravo's resultant injuries.

556.    As a direct and proximate result of the negligence set forth in this Count, Bravo suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Bravo will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XI – STRICT PRODUCT LIABILITY
### GEORGE BRAVO V. SIG SAUER

557.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

558.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

559.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

560.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

561.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

562.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

563.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

564.    The defective condition of the P320 caused Plaintiff's injuries.

565.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

566.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XII – NEGLIGENCE
### KEITH BUINAUSKAS V. SIG SAUER

567.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

568.    At all relevant times, Sig Sauer owed Buinauskas the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

569.    At all relevant times, Sig Sauer owed Buinauskas the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care,

so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

570.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Buinauskas, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

571.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

> i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges;
>
> ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;
>
> iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;
>
> iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;
>
> v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;
>
> vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Buinauskas, of said defective, hazardous and unreasonably dangerous conditions

relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.     By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-intended discharges;

ix.      By including a defective and improper holster in the original packaging with the gun;

x.       By misrepresenting the dangers and hazards posed by the gun;

xi.      By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber.

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors.

xiv.     Other negligent acts and omissions to be developed in the course of discovery.

572.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

573.    The gun's defective condition was not visible, and Buinauskas was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

101

574.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the July 7, 2025, unintended discharge and Buinauskas' resultant injuries.

575.    As a direct and proximate result of the negligence set forth in this Count, Buinauskas suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Buinauskas will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XIII - STRICT PRODUCT LIABILITY
### KEITH BUINAUSKAS V. SIG SAUER

576.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

577.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

     i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

     ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

     iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

578.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

579.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

580.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

581.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

582.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

583.    The defective condition of the P320 caused Plaintiff's injuries.

584.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

585.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XIV – NEGLIGENCE
### THOMAS BURRIS V. SIG SAUER

586.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

587.    At all relevant times, Sig Sauer owed Burris the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

588.    At all relevant times, Sig Sauer owed Burris the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

589.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Burris, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

590.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

      ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent unintended discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Burris, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

591.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

592.    The gun's defective condition was not visible, and Burris was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

593.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the February 4, 2025, unintended discharge and Burris' resultant injuries.

594.    As a direct and proximate result of the negligence set forth in this Count, Burris suffered mental anguish, inconvenience, loss of the capacity for the enjoyment of life, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These emotional injuries are either permanent or continuing in their nature and Burris will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XV - STRICT PRODUCT LIABILITY
### THOMAS BURRIS V. SIG SAUER

595.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

596.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

597.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

598.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

599.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

600.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

601.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

602.    The defective condition of the P320 caused Plaintiff's injuries.

603.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

604.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT XVI – NEGLIGENCE**
**FREDERICK DIAZ V. SIG SAUER**

605.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

606.    At all relevant times, Sig Sauer owed Diaz the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

607.    At all relevant times, Sig Sauer owed Diaz the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

608.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Diaz, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

609.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Diaz, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-intended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

      x.      By misrepresenting the dangers and hazards posed by the gun;

      xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

      xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

      xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

      xiv.   Other negligent acts and omissions to be developed in the course of discovery.

610.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

611.    The gun's defective condition was not visible, and Diaz was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

612.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the March 18, 2025, unintended discharge and Diaz's resultant injuries.

613.    As a direct and proximate result of the negligence set forth in this Count, Diaz suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Diaz will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XVII - STRICT PRODUCT LIABILITY
### FREDERICK DIAZ V. SIG SAUER

614.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

615.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

616.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

617.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

618.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

619.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

620.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

621.    The defective condition of the P320 caused Plaintiff's injuries.

622.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

623.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XVIII – NEGLIGENCE
### STANLEY EDRINGTON JR. V. SIG SAUER

624.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

625.    At all relevant times, Sig Sauer owed Edrington the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

626.    At all relevant times, Sig Sauer owed Edrington the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

627.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Edrington, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

628.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

     i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

     ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

     iii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

     iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

     v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

     vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Edrington, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

629.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

630.    The gun's defective condition was not visible, and Edrington was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

631.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the September 9, 2024, unintended discharge and Edrington's resultant injuries.

632.    As a direct and proximate result of the negligence set forth in this Count, Edrington suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Edrington will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XIX – STRICT PRODUCT LIABILITY
### STANLEY EDRINGTON JR. V. SIG SAUER

633.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

634.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

115

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

635.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

636.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

637.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

638.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

639.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

640.    The defective condition of the P320 caused Plaintiff's injuries.

641.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

642.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XX – NEGLIGENCE
**OSVALDO DIAZ-FERNANDEZ V. SIG SAUER**

643.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

644.    At all relevant times, Sig Sauer owed Diaz-Fernandez the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

645.    At all relevant times, Sig Sauer owed Diaz-Fernandez the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

646.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Diaz-Fernandez, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

647.    Sig Sauer breached the above cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

      ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety,

or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Diaz-Fernandez, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

648.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

649.    The gun's defective condition was not visible, and Diaz-Fernandez was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

650.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the October 5, 2024, unintended discharge and Diaz-Fernandez' resultant injuries.

651.    As a direct and proximate result of the negligence set forth in this Count, Diaz-Fernandez suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Diaz-Hernandez will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXI - STRICT PRODUCT LIABILITY
## OSVALDO DIAZ-FERNANDEZ V. SIG SAUER

652.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

653.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

  i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

  ii.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

  iii.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

  iv.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

654.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

655.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

656.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

657.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

658.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

659.    The defective condition of the P320 caused Plaintiff's injuries.

660.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

661.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXII – BREACH OF IMPLIED WARRANTY
### OSVALDO DIAZ-FERNANDEZ V. SIG SAUER

662.    Plaintiff re-affirms and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

663.    At all relevant times, Sig Sauer was in the business of marketing, selling, and distributing weapons, including Plaintiff's P320 pistol.

664.    Sig Sauer knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

665.    At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of Sig Sauer.

666.    Sig Sauer breached the above-referenced implied warranties as to the gun because, at the time it left Sig Sauer's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended due to Sig Sauer:

    i.    Failing to use due care in designing and manufacturing the P320's internal components and by omitting a mechanical disconnect switch to prevent or mitigate against unintended discharges;

    ii.    Failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

    iii.    Failing to make reasonable tests and/or inspections to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull;

    iv.    Negligently failing to unambiguously warn purchasers/users of the gun of said faulty conditions relating to its design and manufacture;

667.    Failing to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun. Plaintiff, as the end user of the gun, was a person who would foreseeably be injured by Sig Sauer breaching the implied warranties referenced in this Count and Sig Sauer's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein, directly and proximately caused the subject incident on October 5, 2024, and the resulting injuries to Plaintiff.

668.    As a direct and proximate result Defendant's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings

and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

## COUNT XXIII – NEGLIGENCE
## DOUGLAS FORE V. SIG SAUER

669.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

670.    At all relevant times, Sig Sauer owed Fore the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

671.    At all relevant times, Sig Sauer owed Fore the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

672.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Fore, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

673.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts.

i.  By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

ii.  By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.  By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.  By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.  By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.  By negligently failing to unambiguously warn purchasers and end users of the gun, including Fore, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.  By including a defective and improper holster in the original packaging with the gun;

x.   By misrepresenting the dangers and hazards posed by the gun;

xi.  By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii. By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii. By failing to incorporate safeties which were standard among all of the P320s' competitors;

xv.  Other negligent acts and omissions to be developed in the course of discovery.

674.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death

675.   The gun's defective condition was not visible, and Fore was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

676.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 1, 2025, unintended discharge and Fore's resultant injuries.

677.   As a direct and proximate result of the negligence set forth in this Count, Fore suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Fore will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XIV – STRICT PRODUCT LIABILITY
### DOUGLAS FORE V. SIG SAUER

678.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

679.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

     i.     Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

     ii.     The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

     iii.     The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

     iv.     The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

680.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

681.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

682.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

683. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

684. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

685. The defective condition of the P320 caused Plaintiff's injuries.

686. Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

687. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXV – NEGLIGENCE
## SAMUEL KEVIN FOWLER V. SIG SAUER

688. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

689. At all relevant times, Sig Sauer owed Fowler the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

690. At all relevant times, Sig Sauer owed Fowler the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

691.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Fowler, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

692.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Fowler, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix. By including a defective and improper holster in the original packaging with the gun;

x. By misrepresenting the dangers and hazards posed by the gun;

xi. By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii. By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii. By failing to incorporate safeties which were standard among all of the P320s' competitors;

xiv. Other negligent acts and omissions to be developed in the course of discovery.

693. Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

694. The gun's defective condition was not visible, and Fowler was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

695.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the December 21, 2024, unintended discharge and Fowler's resultant injuries.

696.    As a direct and proximate result of the negligence set forth in this Count, Fowler suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Fowler will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XVI - STRICT PRODUCT LIABILITY
### SAMUEL KEVIN FOWLER V. SIG SAUER

697.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

698.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

iv.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

699.   At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

700.   The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

701.   The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

702.   The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

703.   Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

704.   The defective condition of the P320 caused Plaintiff's injuries.

705.   Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

706.   Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXVII – NEGLIGENCE
### JESSE FRISCO V. SIG SAUER

707.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

708.     At all relevant times, Sig Sauer owed Frisco the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

709.     At all relevant times, Sig Sauer owed Frisco the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

710.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Frisco, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

711.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to or mitigate against unintended discharges ;

iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Frisco of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.     By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.     By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

712.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

713.    The gun's defective condition was not visible, and Frisco was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

714.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the January 25, 2025, unintended discharge and Frisco's resultant injuries.

715.    As a direct and proximate result of the negligence set forth in this Count, Frisco suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Frisco will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXVIII - STRICT PRODUCT LIABILITY
### JESSE FRISCO V. SIG SAUER

716.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

134

717.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

718.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

719.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

720.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

721.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

722.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

723.    The defective condition of the P320 caused Plaintiff's injuries.

724.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

725.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXIX – NEGLIGENCE
### YEVGENY GERSHMAN V. SIG SAUER

726.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

727.    At all relevant times, Sig Sauer owed Gershman the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

728.    At all relevant times, Sig Sauer owed Gershman the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

729.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Gershman, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

730. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i. By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges;

ii. By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv. By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull d as described above;

vi. By negligently failing to unambiguously warn purchasers and end users of the gun, including Gershman, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

137

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

731.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

732.    The gun's defective condition was not visible, and Gershman was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

733.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the March 22, 2024, unintended discharge and Gershman's resultant injuries.

734.    As a direct and proximate result of the negligence set forth in this Count, Gershman suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Gershman will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXX - STRICT PRODUCT LIABILITY
### YEVGENY GERSHMAN V. SIG SAUER

735.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

736.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

737.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

738.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

739.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

740.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

741.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

742.    The defective condition of the P320 caused Plaintiff's injuries.

743.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

744.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXI– NEGLIGENCE
### ANDREW GROSS V. SIG SAUER

745.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

746.    At all relevant times, Sig Sauer owed Gross the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

747.    At all relevant times, Sig Sauer owed Gross the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

140

748.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Gross, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

749.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Gross, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

      vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

      viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

      ix.    By including a defective and improper holster in the original packaging with the gun;

      x.    By misrepresenting the dangers and hazards posed by the gun;

      xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

      xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

      xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

      xiv.    Other negligent acts and omissions to be developed in the course of discovery.

750.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

751.    The gun's defective condition was not visible, and Gross was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

752. Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the March 11, 2024, unintended discharge and Gross' resultant injuries.

753. As a direct and proximate result of the negligence set forth in this Count, Gross suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Gross will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXII - STRICT PRODUCT LIABILITY
### ANDREW GROSS V. SIG SAUER

754. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

755. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

143

iv.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

756.   At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

757.   The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

758.   The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

759.   The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

760.   Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

761.   The defective condition of the P320 caused Plaintiff's injuries.

762.   Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

763.   Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXIII – NEGLIGENCE
## COREY HAMILTON V. SIG SAUER

764.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

765.    At all relevant times, Sig Sauer owed Hamilton the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

766.    At all relevant times, Sig Sauer owed Hamilton the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

767.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Hamilton, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

768.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

      ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Hamilton, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

769.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

770.    The gun's defective condition was not visible, and Hamilton was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

771.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the May 26, 2025, unintended discharge and Hamilton's resultant injuries.

772.    As a direct and proximate result of the negligence set forth in this Count, Hamilton suffered severe injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Hamilton will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>**COUNT XXXIV - STRICT PRODUCT LIABILITY**</u>
**COREY HAMILTON V. SIG SAUER**

773.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

774.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

775.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

776.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

777.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

778.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

779.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

780.    The defective condition of the P320 caused Plaintiff's injuries.

781.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

782.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXV – NEGLIGENCE
### WILLIAM KEYES V. SIG SAUER

783.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

784.    At all relevant times, Sig Sauer owed Keyes the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

785.    At all relevant times, Sig Sauer owed Keyes the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

786.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Keyes, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

787.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges;

iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Keyes, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

     ix.    By including a defective and improper holster in the original packaging with the gun;

     x.    By misrepresenting the dangers and hazards posed by the gun;

     xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

     xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

     xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

     xiv.    Other negligent acts and omissions to be developed in the course of discovery.

788.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

789.    The gun's defective condition was not visible, and Keyes was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

790.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the October 14, 2024, unintended discharge and Keyes' resultant injuries.

791.    As a direct and proximate result of the negligence set forth in this Count, Keyes suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Keyes will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXVI - STRICT PRODUCT LIABILITY
### WILLIAM KEYES V. SIG SAUER

792.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

793.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

794.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

795.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

796.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

797.     The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

798.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

799.     The defective condition of the P320 caused Plaintiff's injuries.

800.     Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

801.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXVII – NEGLIGENCE
### RICHARD KOSTNER V. SIG SAUER

802.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

803.     At all relevant times, Sig Sauer owed Kostner the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

804.     At all relevant times, Sig Sauer owed Kostner the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

805.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Kostner, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

806.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Kostner, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and
       unreasonably dangerous conditions relating to the gun's
       propensity to discharge without an intentional trigger pull
       while in the possession of Sig Sauer, and during which times
       employees, servants or agents of Sig Sauer had an
       opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere
       "vibration" of the gun in a conspicuous manner, such as on
       its case, which could be easily understood by a consumer,
       instead of relying on changing the bottom of page 25 of the
       user manual for the gun after several incidents of unintended
       discharges;

ix.    By including a defective and improper holster in the original
       packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the
       gun;

xi.    By failing to design a firearm that would be safe for all users
       to operate under ordinary circumstances;

xii.   By negligently misrepresenting that the P320 is safe when
       carried with a round in the chamber;

xiii.  By failing to incorporate safeties which were standard
       among all of the P320s' competitors; and

xiv.   Other negligent acts and omissions to be developed in the
       course of discovery.

807.   Sig Sauer knew, or should have known, that exposing users to the dangerous and

defective and hazardous conditions existing in the gun would or could give rise to serious bodily

injuries to such users, up to and including death.

808.   The gun's defective condition was not visible, and Kostner was not capable of

realizing the dangerous condition and could not have discovered the dangerous condition even

upon performing a reasonable inspection of the same.

155

809.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the January 15, 2025, unintended discharge and Kostner's resultant injuries.

810.    As a direct and proximate result of the negligence set forth in this Count, Kostner suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Kostner will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXVIII - STRICT PRODUCT LIABILITY
### RICHARD KOSTNER V. SIG SAUER

811.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

812.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

813.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

814.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

815.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

816.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

817.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

818.    The defective condition of the P320 caused Plaintiff's injuries.

819.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

820.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXIX – NEGLIGENCE
## PHILLIP LUKASICK V. SIG SAUER

821.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

822.    At all relevant times, Sig Sauer owed Lukasick the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

823.    At all relevant times, Sig Sauer owed Lukasick the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

824.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Lukasick, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

825.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

   i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges;

   ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Lukasick, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

826.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

827.    The gun's defective condition was not visible, and Lukasick was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

828.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the February 26, 2025, unintended discharge and Lukasick's resultant injuries.

829.    As a direct and proximate result of the negligence set forth in this Count, Lukasick suffered auditory injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Lukasick will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XL - STRICT PRODUCT LIABILITY
### PHILLIP LUKASICK V. SIG SAUER

830.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

831.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

832.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

833.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

834.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

835.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

836.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

837.    The defective condition of the P320 caused Plaintiff's injuries.

838.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

839.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>**COUNT XLI – NEGLIGENCE**</u>
**SHAWN MICCICHE V. SIG SAUER**

840.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

841.    At all relevant times, Sig Sauer owed Micciche the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

842.    At all relevant times, Sig Sauer owed Micciche the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

843.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Micciche, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

162

844.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.   By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

ii.   By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges;

iv.   By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.   By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Micciche, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii. By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

845.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

846.   The gun's defective condition was not visible, and Micciche was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

847.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the April 10, 2024, unintended discharge and Micciche's resultant injuries.

848.   As a direct and proximate result of the negligence set forth in this Count, Micciche suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Micciche will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLII - STRICT PRODUCT LIABILITY
### SHAWN MICCICHE V. SIG SAUER

849.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

850.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

     i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

     ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

     iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

     iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

851.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

852.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

853.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

854. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

855. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

856. The defective condition of the P320 caused Plaintiff's injuries.

857. Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

858. Sig Sauer is therefore strictly liable to Plaintiff. .

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLIII – NEGLIGENCE
### BILLY OLIVARRIA V. SIG SAUER

859. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

860. At all relevant times, Sig Sauer owed Olivarria the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

861. At all relevant times, Sig Sauer owed Olivarria the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

166

862.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Olivarria, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery

863.    Sig Sauer breached the above cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges;

    iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

    vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Olivarria, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

      vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

      viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

      ix.    By including a defective and improper holster in the original packaging with the gun;

      x.    By misrepresenting the dangers and hazards posed by the gun;

      xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

      xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

      xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

      xiv.    Other negligent acts and omissions to be developed in the course of discovery.

864.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

865.    The gun's defective condition was not visible, and Olivarria was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

866.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the February 28, 2025, unintended discharge and Olivarria's resultant injuries.

867.    As a direct and proximate result of the negligence set forth in this Count, Olivarria suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Olivarria will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLIV - STRICT PRODUCT LIABILITY
### BILLY OLIVARRIA V. SIG SAUER

868.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

869.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

      iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

870.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

871.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

872.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

873.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

874.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

875.    The defective condition of the P320 caused Plaintiff's injuries.

876.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

877.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLV – NEGLIGENCE
**ALBERT RIVERA V. SIG SAUER**

878.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

879.    At all relevant times, Sig Sauer owed Rivera the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

880.    At all relevant times, Sig Sauer owed Rivera the duty to design manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

881.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Rivera, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

882.    Sig Sauer breached the above-cited duties in various ways, including but not limited to one or more of the following negligent acts:

     i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

     ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

171

iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges;

iv.   By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.   By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Rivera, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.   By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.   By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

883.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

884.    The gun's defective condition was not visible, and Rivera was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

885.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 27, 2023, unintended discharge and Rivera's resultant injuries.

886.    As a direct and proximate result of the negligence set forth in this Count, Rivera suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Rivera will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVI - STRICT PRODUCT LIABILITY
### ALBERT RIVERA V. SIG SAUER

887.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

888.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

889.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

890.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

891.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

892.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

893.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

894.     The defective condition of the P320 caused Plaintiff's injuries.

895.     Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

896.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT XLVII – NEGLIGENCE**
**CHRISTOPHER RUSSELL V. SIG SAUER**

897.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

898.     At all relevant times, Sig Sauer owed Russell the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

899.     At all relevant times, Sig Sauer owed Russell the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

900.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Russell, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or

175

had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

901.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull  as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Russell, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

902.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

903.    The gun's defective condition was not visible, and Russell was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

904.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the September 27, 2025, unintended discharge and Russell's resultant injuries.

905.    As a direct and proximate result of the negligence set forth in this Count, Russell suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same,

loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Russell will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVIII - STRICT PRODUCT LIABILITY
### CHRISTOPHER RUSSELL V. SIG SAUER

906.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

907.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

908.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

909.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

910.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

911.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

912.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

913.    The defective condition of the P320 caused Plaintiff's injuries.

914.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

915.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLIX – NEGLIGENCE
### DALLAS QUARRELS V. SIG SAUER

916.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

917.    At all relevant times, Sig Sauer owed Quarrels the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

918.    At all relevant times, Sig Sauer owed Quarrels the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

919.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Quarrels, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

920.    Sig Sauer breached the above-cited duties in various ways, including but not limited to one or more of the following negligent acts:

      i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges;

      ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

      iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges;

      iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

      v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Quarrels, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii. By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

921.  Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

922.     The gun's defective condition was not visible, and Quarrels was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

923.     Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the April 9, 2025, unintended discharge and Quarrels's resultant injuries.

924.     As a direct and proximate result of the negligence set forth in this Count, Quarrels suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Quarrels will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT L - STRICT PRODUCT LIABILITY
### DALLAS QUARRELS V. SIG SAUER

925.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

926.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

      i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

ii.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

iii.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

iv.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

927.   At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

928.   The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

929.   The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

930.   The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

931.   Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

932.   The defective condition of the P320 caused Plaintiff's injuries.

933.   Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

934.   Sig Sauer is therefore strictly liable to Plaintiff..

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit,

and all other claims available by law.

<strong><u>COUNT LI – BREACH OF IMPLIED WARRANTY</u></strong><br><strong>DALLAS QUARRELS V. SIG SAUER</strong>

935.     Plaintiff re-affirms and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

936.     At all relevant times, Sig Sauer was in the business of marketing, selling, and distributing weapons, including Plaintiff's P320 pistol.

937.     Sig Sauer knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

938.     At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of Sig Sauer.

939.     Sig Sauer breached the above-referenced implied warranties as to the gun because, at the time it left Sig Sauer's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended due to Sig Sauer:

i.      Failing to use due care in designing and manufacturing the P320's internal components and by omitting a mechanical disconnect switch to prevent or mitigate against unintended discharges;

ii.     Failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

iii.    Failing to make reasonable tests and/or inspections to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull;

iv.     Negligently failing to unambiguously warn purchasers/users of the gun of said faulty conditions relating to its design and manufacture;

184

v.    Failing to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun.

940.    Plaintiff, as the end user of the gun, was a person who would foreseeably be injured by Sig Sauer breaching the implied warranties referenced in this Count and Sig Sauer's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein, directly and proximately caused the subject incident on April 9, 2025 and the resulting injuries to Plaintiff.

941.    As a direct and proximate result Defendant's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

## COUNT LII– NEGLIGENCE
### FLETCHER SCHIEFELBEIN V. SIG SAUER

942.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

943.    At all relevant times, Sig Sauer owed Schiefelbein the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

944.    At all relevant times, Sig Sauer owed Schiefelbein the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

945.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Schiefelbein, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

946.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

    iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

186

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Schiefelbein, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

947.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

948. The gun's defective condition was not visible, and Schiefelbein was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

949. Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the February 2, 2025, unintended discharge and Schiefelbein's resultant injuries.

950. As a direct and proximate result of the negligence set forth in this Count, Schiefelbein suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Schiefelbein will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>**COUNT LIII - STRICT PRODUCT LIABILITY**</u>
**FLETCHER SCHIEFELBEIN V. SIG SAUER**

951. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

952. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

    i. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

953.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

954.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

955.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

956.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

957.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

958.    The defective condition of the P320 caused Plaintiff's injuries.

959.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

960.    Sig Sauer is therefore strictly liable to Plaintiff..

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit,

and all other claims available by law.

### COUNT LIV – NEGLIGENCE
### JOSHUA SOUTHARD V. SIG SAUER

961.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

962.    At all relevant times, Sig Sauer owed Southard the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

963.    At all relevant times, Sig Sauer owed Southard the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

964.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Southard, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

965.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety,

or grip safety to prevent or mitigate against unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges s;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Southard, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

966.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

967.    The gun's defective condition was not visible, and Southard was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

968.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the March 17, 2025, unintended discharge and Southard's resultant injuries.

969.    As a direct and proximate result of the negligence set forth in this Count, Southard suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Micciche will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LV- STRICT PRODUCT LIABILITY
### JOSHUA SOUTHARD V. SIG SAUER

970.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

971.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

   i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   ii.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   iii.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   iv.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

972.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

973.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

974.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

975.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

976.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

977.    The defective condition of the P320 caused Plaintiff's injuries.

978.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

979.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVI – NEGLIGENCE
### ROBIN TARBUTTON-WOODWARD V. SIG SAUER

980.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

981.    At all relevant times, Sig Sauer owed Tarbutton-Woodward the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

982.    At all relevant times, Sig Sauer owed Tarbutton-Woodward the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

983.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Tarbutton-Woodward, of known or suspected defects

that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig

Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of

informal and formal claims arising from substantially similar incidents, internal testing and

research, industry publications and research, and other sources of information to be developed in

discovery.

984.    Sig Sauer breached the above-cited duties in various ways, including but not limited

to, one or more of the following negligent acts

i.      By failing to use due care in designing and manufacturing
        the P320's firing and striker assembly to or mitigate against
        unintended discharges ;

ii.     By failing to use due care in designing the P320, failing to
        incorporate a manual external safety, tabbed trigger safety,
        or grip safety to prevent or mitigate against unintended
        discharges;

iii.    By failing to use due care in designing and manufacturing
        the P320's internal components, including its sear, and by
        omitting a mechanical disconnect switch, to prevent or
        mitigate against unintended discharges ;

iv.     By failing to issue a mandatory recall of the P320 as Sig
        Sauer had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to
        discover the defective, hazardous and unreasonably
        dangerous conditions relating to the gun's propensity to
        discharge without an intentional trigger pull as described
        above;

vi.     By negligently failing to unambiguously warn purchasers
        and end users of the gun, including Tarbutton-Woodward, of
        said defective, hazardous and unreasonably dangerous
        conditions relating to its design and manufacture, about
        which it knew or should have known through the exercise of
        ordinary care;

vii.    By failing to discover the defective, hazardous and
        unreasonably dangerous conditions relating to the gun's

propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.  By including a defective and improper holster in the original packaging with the gun;

x.  By misrepresenting the dangers and hazards posed by the gun;

xi.  By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.  By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

985.  Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

986.  The gun's defective condition was not visible, and Tarbutton-Woodward was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

987.  Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the September 21, 2025, unintended discharge and Tarbutton-Woodward's resultant injuries.

988.    As a direct and proximate result of the negligence set forth in this Count, Tarbutton-Woodward suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Tarbutton-Woodward will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVII - STRICT PRODUCT LIABILITY
### ROBIN TARBUTTON-WOODWARD V. SIG SAUER

989.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

990.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

   i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

991.    At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

992.    The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

993.    The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

994.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

995.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

996.    The defective condition of the P320 caused Plaintiff's injuries.

997.    Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

998.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVIII – NEGLIGENCE
### RAPHAEL VELEZ V. SIG SAUER

999.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

1000.   At all relevant times, Sig Sauer owed Velez the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

1001.   At all relevant times, Sig Sauer owed Velez the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

1002.   At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Velez, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

1003.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

> i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;
>
> ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;
>
> iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;
>
> iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Velez, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.      By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

1004.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

1005.   The gun's defective condition was not visible, and Velez was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

1006.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the May 20, 2024, unintended discharge and Velez's resultant injuries.

1007.   As a direct and proximate result of the negligence set forth in this Count, Velez suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Velez will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LIX - STRICT PRODUCT LIABILITY
### RAPHAEL VELEZ V. SIG SAUER

1008.   Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

1009.   Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

i.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

ii.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

iii.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

iv.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

1010.   At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

1011.   The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

1012.   The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

1013.   The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

1014.   Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

1015.   The defective condition of the P320 caused Plaintiff's injuries.

1016.   Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

1017.   Sig Sauer is therefore strictly liable to Plaintiff.

202

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LX – NEGLIGENCE
### CHRISTOPHER WEST V. SIG SAUER

1018.   Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

1019.   At all relevant times, Sig Sauer owed West the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional user trigger pull before selling the gun and placing it into the stream of commerce.

1020.   At all relevant times, Sig Sauer owed West the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

1021.   At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including West, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

1022.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

ii. By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv. By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi. By negligently failing to unambiguously warn purchasers and end users of the gun, including West, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix. By including a defective and improper holster in the original packaging with the gun;

x. By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

1023.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

1024.   The gun's defective condition was not visible, and West was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

1025.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the February 20, 2025, unintended discharge and West's resultant injuries.

1026.   As a direct and proximate result of the negligence set forth in this Count, West suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and West will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXI - STRICT PRODUCT LIABILITY
### CHRISTOPHER WEST V. SIG SAUER

1027.   Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

1028.   Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

 i.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

 ii.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

 iii.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

 iv.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

1029.   At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

1030.   The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

1031.   The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

1032.   The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

1033. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

1034. The defective condition of the P320 caused Plaintiff's injuries.

1035. Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

1036. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXII – NEGLIGENCE
### ADAM WILSON V. SIG SAUER

1037. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

1038. At all relevant times, Sig Sauer owed Wilson the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

1039. At all relevant times, Sig Sauer owed Wilson the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without an intentional trigger pull before selling the gun and placing it into the stream of commerce.

1040. At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Wilson, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or

had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

1041.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts

      i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent or mitigate against unintended discharges ;

      ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

     iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

     iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

      v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

     vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Wilson, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

    vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

ix.  By including a defective and improper holster in the original packaging with the gun;

x.  By misrepresenting the dangers and hazards posed by the gun;

xi.  By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.  By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

1042.  Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

1043.  The gun's defective condition was not visible, and Wilson was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

1044.  Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 17, 2024, unintended discharge and Wilson's resultant injuries.

1045.  As a direct and proximate result of the negligence set forth in this Count, Wilson suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same,

loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Wilson will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXIII – STRICT PRODUCT LIABILITY
### ADAM WILSON V. SIG SAUER

1046. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

1047. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable to Plaintiff because:

 i. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

 ii. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

 iii. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

 iv. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

1048. At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

1049. The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

1050.  The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

1051.  The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

1052.  Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

1053.  The defective condition of the P320 caused Plaintiff's injuries.

1054.  Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

1055.  Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXIV - BREACH OF IMPLIED WARRANTY
### ADAM WILSON V. SIG SAUER

1056.  Plaintiff re-affirms and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

1057.  At all relevant times, Sig Sauer was in the business of marketing, selling, and distributing weapons, including Plaintiff's P320 pistol.

1058.  Sig Sauer knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which

included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

1059.  At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of Sig Sauer.

1060.  Sig Sauer breached the above-referenced implied warranties as to the gun because, at the time it left Sig Sauer's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended due to Sig Sauer:

    i. Failing to use due care in designing and manufacturing the P320's internal components and by omitting a mechanical disconnect switch to prevent or mitigate against unintended discharges;

    ii. Failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

    iii. Failing to make reasonable tests and/or inspections to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull;

    iv. Negligently failing to unambiguously warn purchasers/users of the gun of said faulty conditions relating to its design and manufacture;

    v. Failing to discover the potentially dangerous conditions relating to the gun's ability to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun.

1061.  Plaintiff, as the end user of the gun, was a person who would foreseeably be injured by Sig Sauer breaching the implied warranties referenced in this Count and Sig Sauer's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein,

directly and proximately caused the subject incident on November 17, 2024, and the resulting injuries to Plaintiff.

1062.   As a direct and proximate result Defendant's breach of the implied warranties of merchantability and/or fitness for a particular purpose, as alleged herein, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.   These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT LXV – NEGLIGENCE**
**COLIN YAKISH V. SIG SAUER**

1063.   Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

1064.   At all relevant times, Sig Sauer owed Yakish the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

1065.   At all relevant times, Sig Sauer owed Yakish the duty to design, manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

1066.   At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Yakish, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

1067.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to or mitigate against unintended discharges ;

ii.   By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent or mitigate against unintended discharges;

iii.  By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent or mitigate against unintended discharges ;

iv.   By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Yakish, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

      vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge without an intentional trigger pull while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

      viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintended discharges;

      ix.    By including a defective and improper holster in the original packaging with the gun;

      x.    By misrepresenting the dangers and hazards posed by the gun;

      xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

      xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

      xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

      xiv.    Other negligent acts and omissions to be developed in the course of discovery.

1068.  Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

1069.  The gun's defective condition was not visible, and Yakish was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

1070.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the December 7, 2024, unintended discharge and Yakish's resultant injuries.

1071.   As a direct and proximate result of the negligence set forth in this Count, Yakish suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.   These injuries are either permanent or continuing in their nature, and Yakish will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXVI – STRICT PRODUCT LIABILITY
### COLIN YAKISH V. SIG SAUER

1072.   Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

1073.   Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is liable to Plaintiff because:

    i.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    ii.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    iii.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

      iv.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

1074.   At all relevant times, the P320 was used in a manner that was intended or directed or reasonably foreseeable to, and was known or foreseen by, Sig Sauer.

1075.   The P320 was in a defective condition, as it failed to perform in the manner reasonably to be expected in light of its nature and intended function.

1076.   The P320 was in a defective condition, as the danger contained therein was unknowable and unacceptable to the average or ordinary customer.

1077.   The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

1078.   Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

1079.   The defective condition of the P320 caused Plaintiff's injuries.

1080.   Defendant's failure to warn of the P320's susceptibility to discharge without an intentional trigger pull caused Plaintiff's injuries.

1081.   Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXVII - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### MICHAEL ANDERSON V. SIG SAUER

1082.   Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

1083.   On October 14, 2024, Plaintiff Michael Anderson was hunting with his friend, Plaintiff William Keyes, and was the only witness to Plaintiff Keyes' P320 unintentionally discharging.

1084.   Following the incident, Anderson applied first-aid to Keyes' injuries while they waited for emergency services to arrive.

1085.   Plaintiff Michael Anderson was in close proximity to Keyes when his P320 unintentionally discharged, and had a sensory and contemporaneous observation of this incident that seriously injured Plaintiff Keyes.

1086.   Plaintiff Anderson. was in the zone of danger created by Defendants' carelessness, negligence, gross negligence, recklessness, outrageous conduct and other liability-producing conduct, and the incident.

1087.   As a result of the Defendants' aforementioned negligence, gross negligence, careless and reckless conduct and/or other liability producing conduct and contemporaneously witnessing the dramatic and devastating events of William Keyes' accident, as well as being within the zone of danger, Plaintiff, Michael Anderson, suffered severe injuries and losses that include emotional and psychological harm, emotional distress, mental and physical anguish, physical pain and suffering, shock and loss of life's pleasures, the full extent of which are not yet known.

1088.   As a result of Defendants' negligence, gross negligence, careless and reckless conduct and/or other liability producing conduct, as previously averred herein, Defendant is are liable to Plaintiff, Michael Anderson for negligent infliction of emotional distress.

## COUNT LXVIII – LOSS OF CONSORTIUM

**CLAUDIA SANDOVAL-BLUTO V. SIG SAUER**

1089.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1090.   At all relevant times hereto, Plaintiff, Claudia Sandoval-Bluto, was the lawfully wedded wife of husband-plaintiff, Jeremy Bluto, with whom she lives.

1091.   As a result of the injuries sustained by Mr. Bluto, wife-plaintiff Claudia Sandoval-Bluto has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXIX – LOSS OF CONSORTIUM
### ADRIENNE BOWLES V. SIG SAUER

1092.   Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1093.   At all relevant times hereto, Plaintiff, Adrienna Bowles, was the lawfully wedded wife of husband-plaintiff, Damone Bowles, with whom she lives.

1094.   As a result of the injuries sustained by Mr. Bowles, wife-plaintiff Mrs. Bowles has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXX – LOSS OF CONSORTIUM
### MARCI BUINAUSKAS V. SIG SAUER

1095.   Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1096.   At all relevant times hereto, Plaintiff, Marci Buinauskas, was the lawfully wedded wife of husband-plaintiff, Keith Buinauskas, with whom she lives.

1097.   As a result of the injuries sustained by Mr. Buinauskas, wife-plaintiff Mrs. Buinauskas has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXI – LOSS OF CONSORTIUM
### BETTY BURRIS V. SIG SAUER

1098.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1099.   At all relevant times hereto, Plaintiff, Betty Burris, was the lawfully wedded wife of husband-plaintiff, Thomas Burris, with whom she lives.

1100.   As a result of the injuries sustained by Mr. Burris, wife-plaintiff Mrs. Burris has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXII – LOSS OF CONSORTIUM
### TAMMY EDRINGTON V. SIG SAUER

1101.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1102.   At all relevant times hereto, Plaintiff, Tammy Edrington, was the lawfully wedded wife of husband-plaintiff, Stanley Edrington, with whom she lives.

1103.   As a result of the injuries sustained by Mr. Edrington, wife-plaintiff Mrs. Edrington has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXIII – LOSS OF CONSORTIUM
### ALISHA LEE FERNANDEZ V. SIG SAUER

1104.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1105.   At all relevant times hereto, Plaintiff, Alisha Lee Fernandez, was the lawfully wedded wife of husband-plaintiff, Osvaldo Diaz-Fernandez, with whom she lives.

1106.   As a result of the injuries sustained by Mr. Fernandez, wife-plaintiff Mrs. Fernandez has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXIV – LOSS OF CONSORTIUM
## LEAH RENEE KRAUTTER V. SIG SAUER

1107.  Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1108.  At all relevant times hereto, Plaintiff, Leah Renee Krautter, was the lawfully wedded wife of husband-plaintiff, Douglas Fore, with whom she lives.

1109.  As a result of the injuries sustained by Mr. Fore, wife-plaintiff Ms. Krautter has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXV – LOSS OF CONSORTIUM
## MARCELLE FOWLER V. SIG SAUER

1110.  Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1111.  At all relevant times hereto, Plaintiff, Marcelle Fowler, was the lawfully wedded wife of husband-plaintiff, Samuel Kevin Fowler, with whom she lives.

1112.  As a result of the injuries sustained by Mr. Fowler, wife-plaintiff Mrs. Fowler has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXVI – LOSS OF CONSORTIUM
### KATIE GERSHMAN V. SIG SAUER

1113.  Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1114.  At all relevant times hereto, Plaintiff, Katie Gershman, was the lawfully wedded wife of husband-plaintiff, Yevgeny Gershman, with whom she lives.

1115.  As a result of the injuries sustained by Mr. Gershman, wife-plaintiff Mrs. Gershman, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXVII – LOSS OF CONSORTIUM
### MEGAN  HAMILTON V. SIG SAUER

1116.  Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1117.  At all relevant times hereto, Plaintiff, Megan Hamilton, was the lawfully wedded wife of husband-plaintiff, Corey Hamilton, with whom she lives.

1118.  As a result of the injuries sustained by Mr. Hamilton, wife-plaintiff Mrs. Hamilton, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXVIII – LOSS OF CONSORTIUM
### MEREDITH LUKASICK V. SIG SAUER

1119.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1120.   At all relevant times hereto, Plaintiff, Meredith Lukasick, was the lawfully wedded wife of husband-plaintiff, Phillip Lukasick, with whom he lives.

1121.   As a result of the injuries sustained by Mr. Lukasick, wife-plaintiff Mrs. Lukasick has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to his great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXIX – LOSS OF CONSORTIUM
### LAURA MICCICHE V. SIG SAUER

1122.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1123.   At all relevant times hereto, Plaintiff, Laura Micciche, was the lawfully wedded wife of husband-plaintiff, Shawn Micciche, with whom she lives.

1124.   As a result of the injuries sustained by Mr. Micciche, wife-plaintiff Mrs. Micciche has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXX – LOSS OF CONSORTIUM
### CRYSTAL OLIVARRIA V. SIG SAUER

1125.  Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1126.  At all relevant times hereto, Plaintiff, Crystal Olivarria, was the lawfully wedded wife of husband-plaintiff, Billy Olivarria, with whom she lives.

1127.  As a result of the injuries sustained by Mr. Olivarria, wife-plaintiff Mrs. Olivarria has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXXI – LOSS OF CONSORTIUM
### ANGELA RUSSELL V. SIG SAUER

1128.  Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1129.  At all relevant times hereto, Plaintiff, Angela Russell, was the lawfully wedded wife of husband-plaintiff, Christopher Russell, with whom she lives.

1130.  As a result of the injuries sustained by Mr. Russell, wife-plaintiff Mrs. Russell has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXXII – LOSS OF CONSORTIUM
### JENNIFER QUARRELS V. SIG SAUER

1131.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1132.   At all relevant times hereto, Plaintiff, Jennifer Quarrels, was the lawfully wedded wife of husband-plaintiff, Dallas Quarrels, with whom she lives.

1133.   As a result of the injuries sustained by Mr. Quarrels, wife-plaintiff Mrs. Quarrels has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXXIII – LOSS OF CONSORTIUM
### CHRISTY SCHIEFELBEIN V. SIG SAUER

1134.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1135.   At all relevant times hereto, Plaintiff, Christy Schiefelbein, was the lawfully wedded wife of husband-plaintiff, Fletcher Schiefelbein, with whom she lives.

1136.   As a result of the injuries sustained by Mr. Schiefelbein, wife-plaintiff Mrs. Schiefelbein has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXXIV – LOSS OF CONSORTIUM
### WILLIAM WOODWARD V. SIG SAUER

1137.  Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1138.  At all relevant times hereto, Plaintiff, William Woodward, was the lawfully wedded husband of wife-plaintiff, Robin Tarbutton-Woodward, with whom he lives.

1139.  As a result of the injuries sustained by Ms. Tarbutton-Woodward, husband-plaintiff Mr. Woodward has been and will continue to be deprived of the love, assistance, companionship, consortium and society of his wife, all to his great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXXV – LOSS OF CONSORTIUM
### NATALIE WEST V. SIG SAUER

1140.  Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1141.  At all relevant times hereto, Plaintiff, Natalie West, was the lawfully wedded wife of husband-plaintiff, Christopher West, with whom she lives.

1142.  At all relevant times, Mrs. West was, and remains, functionally blind, and relies on her husband for daily support, care, and assistance, including transportation, meal preparation, and general household responsibilities.

1143.  As a result of the injuries sustained by Mr. West, wife-plaintiff Mrs. West has been and will continue to be deprived of the love, assistance, daily support and caregiving, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXXVI – LOSS OF CONSORTIUM
### RACHEL WILSON V. SIG SAUER

1144.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

1145.    At all relevant times hereto, Plaintiff, Rachel Wilson, was the lawfully wedded wife of husband-plaintiff, Adam Wilson, with whom she lives.

1146.    As a result of the injuries sustained by Mr. Wilson, wife-plaintiff Mrs. Wilson has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Respectfully submitted,

**SALTZ MONGELUZZI & BENDESKY P.C.**

By:    */s/ Robert W. Zimmerman*

ROBERT J. MONGELUZZI, PA Bar #36283
LARRY BENDESKY, PA Bar #51026
ROBERT W. ZIMMERMAN, PA Bar #208410
RYAN D. HURD, PA Bar #205955
SAMUEL A. HAAZ, PA Bar #314507
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
(215) 496-8282
rmongeluzzi@smbb.com
lbendesky@smbb.com
rzimmerman@smbb.com
rhurd@smbb.com
shaaz@smbb.com

Date:  November 24, 2025.